INTERSTATE COMMERCE COMMISSION *v.* BALTIMORE & O. R. Co.

(*Circuit Court, S. D. Ohio, W. D.*　August 11, 1890.)

1. CARRIERS—INTERSTATE COMMERCE ACT—PARTY-RATE TICKETS.

The issuance of "party-rate tickets," each good for a party of ten persons, at the rate of two cents per mile *per capita*, while single passengers are charged three cents per mile, is neither an unjust discrimination nor an undue or unreasonable preference or advantage, within the purview of the interstate commerce act, where such party-rate tickets are offered to the public generally, and where it appears that the rate charged single passengers is not unreasonable.

2. SAME—BURDEN OF PROOF.

Where a railroad company is charged with violating the interstate commerce act, by the issuance of "party-rate tickets" at less than the rates charged single passengers, the burden of proving that such lower charge constitutes an undue preference is upon the person making the charge.

3. SAME—CONSTRUCTION OF ENGLISH ACTS.

The interstate commerce act having adopted substantially some of the provisions of the English railway traffic acts of 1845 and 1854, the construction given to such provisions by the English courts must be received as incorporated into the act. Following *McDonald* v. *Hovey*, 110 U. S. 619, 4 Sup. Ct. Rep. 142.

In Equity.

*A. G. Safford* and *John W. Herron*, for complainant.

*John K. Cowen, Harmon, Colston, Goldsmith & Hoadly*, and *Hugh L. Bond, Jr.*, for respondent.

Before JACKSON and SAGE, JJ.

JACKSON, J.　This is an application or proceeding under the provision of the interstate commerce act, by the interstate commerce commission, for the issuance by this court of a writ of injunction, or other proper process, mandatory or otherwise, to restrain the Baltimore & Ohio Railroad Company from further continuing in its violation of certain orders of said commission, and for a decree requiring said railroad company to pay such sum of money, not exceeding the sum of $500, for every day after a day to be named in the decree that said defendant shall fail to obey said injunction or other proper process.　The orders of the commission, which this court is asked to enforce by its injunction or mandatory process, were made upon a complaint filed before the interstate commerce commission by the Pittsburgh, Cincinnati & St. Louis Railway Company, against the Baltimore & Ohio Railroad Company, which set forth and alleged that the petitioner was duly incorporated under the laws of Pennsylvania, West Virginia, and Ohio, and was engaged as a common carrier in operating a system of railroads, extending from Pittsburgh, Pa., to various towns and cities in said state; that the Baltimore & Ohio Railroad Company was duly incorporated under the laws of the state of Maryland, and was also a common carrier operating a system of railroads, a part of which extended from said city of Pittsburgh to many of the important towns and cities in the above-named states, which were reached by petitioner's lines of road, and thus made it a competitor of petitioner in respect to business between said points; that upon its lines of road on which business competitive with

that of petitioner was transacted the Baltimore & Ohio Railroad Company had put into effect, and had then in operation, so-called "party-rates," whereby parties of ten or more persons traveling on one ticket were transported over said lines of road, between stations located thereon, at two cents per mile *per capita*, which was less than the rate for a single person, the rate for a single passenger being about three cents per mile; that said Baltimore & Ohio Railroad Company was also in the habit of selling round-trip excursion tickets, good between points on its lines of railway, at less than rates charged for ordinary tickets, without publicly posting in its ticket offices, or elsewhere, the rates at which said excursion tickets were sold; that the issuance of said "party-rate" tickets, and the selling of excursion tickets without posting the rates therefor, were in violation of the interstate commerce act, in petitioner's judgment, and for that reason it had declined to place the same in effect upon its lines; that by reason of said "party rates" and excursion rates so allowed and issued by said Baltimore & Ohio Railroad Company traffic was diverted from petitioner's lines to those of the Baltimore & Ohio Company; and that petitioner was greatly damaged by loss of revenue thereby,—wherefore petitioner prayed that the Baltimore & Ohio Railroad Company should be required, by an order of the commission, to withdraw from its lines of road in which business competitive with that of petitioner was transacted said "party rates," and to decline to give such rates in future; and also requiring said company to discontinue the practice of selling excursion tickets at less than the regular rate unless the rates for such tickets were posted in its offices. The Baltimore & Ohio Railroad Company answered said complaint, admitting the corporate character and business of the two companies as stated in the petition, admitting that it had and did sell, on or between special dates, round-trip excursion tickets at less rate than those charged for ordinary tickets without posting notice of the same in its ticket offices, except by way of advertisement. It claimed that said excursion tickets so sold were such excursion tickets as are mentioned in the twenty-second section of the act to regulate commerce, which the act did not require should be posted, and which it would be practically useless, if not impossible, to post, but that defendant published such rates through the usual means employed by all other railroad companies, as by newspapre advertisements, hand-bills, etc.

The defendant admitted that it had issued the so-called "Party Rates," which, it claimed, were in no way a violation of the act to regulate commerce, but, on the contrary, were an accommodation to the public, necessary to the business of theatrical and amusement companies and others traveling together in a large body. The defendant also denied that the petitioner had any right to institute said proceedings before the commission; that it was not such a complainant as the act to regulate commerce authorized to make complaint, its alleged injury from defendant's acts arising or resulting to it only as a competing carrier; and defendant moved to dismiss said petition on said ground, and because petitioner did not allege facts sufficient to bring it within any of the classes

of persons, firms, corporations, or associations who could properly institute such proceedings.    This motion was either not insisted upon, or was denied, as the commission proceeded to hear and consider the complaint, and on February 21, 1890, filed its report in the premises, holding—*First*, that passenger excursion rates are required to be published according to the provisions of section 6 of the act to regulate commerce, and that the practice of the Baltimore & Ohio Railroad Company of selling round-trip excursion tickets at less than rates charged for ordinary tickets, without publicly posting in its ticket offices the rates at which such excursion tickets were sold, was in violation of the law; and, *secondly*, that "party-rate" tickets are not commutation tickets within the true meaning of section 22 of the act, and when party rates to 10 or more persons traveling together on a single ticket are lower than contemporaneous rates for single passengers, they constitute discrimination, and are illegal.    It was thereupon ordered and adjudged by the commission—*First*, that the Baltimore & Ohio Railroad Company "be and it is hereby required to print, post, and file schedules showing the rates, fares, and charges now or hereafter established by it for round-trip passenger excursion tickets between points on its lines or between points on its lines and points on the lines of other common carriers with whom it joins or hereafter may join in establishing rates, fares, and charges therefor, in conformity with the provisions of section 6 of the act to regulate commerce;" and, *secondly*, "that the Baltimore & Ohio Railroad Company do forthwith wholly and immediately cease and desist from charging rates for transportation over its lines of a number of persons traveling together in one party, which are less for each person than rates contemporaneously charged by said defendant under schedules lawfully in effect for the transportation of single passengers between the same points." Notice embodying said orders, together with a copy of the commission's report and opinion, was duly sent to and received by the defendant. Thereafter, on May 1, 1890, the interstate commerce commission filed its petition or bill in this court against the Baltimore & Ohio Railroad Company, setting forth the foregoing proceedings before and orders made by the commission, and charging that the defendant, since the issuance and service upon it of said orders, had wholly disregarded and set at naught the authority and commands of said commission; that it had neglected and refused, and still does neglect and refuse, to furnish the commission, and to print, post, and file, schedules showing the rates, fares, and charges established by it for round-trip passenger excursion tickets, as required by law, and as in and by the order of the commission it was enjoined and required to do; and, further, that defendant had not ceased and desisted from charging rates for the transportation over its lines of a number of persons traveling together in one party, on a single ticket, which are less for each person of such party than rates contemporaneously charged by it under schedules lawfully in effect for the transportation of single passengers between the same points, as in and by said order of the commission it was required to cease from doing.    After setting out various instances in which the defendant had,

since the promulgation of said order, issued such "party-rate" tickets, the petition or bill invokes the aid of this court to compel obedience on the part of defendant to the requirements of said orders and to punish it as prescribed .by the statute for its continual disregard thereof. The defendant duly entered its appearance and filed its answer. After admitting the proceedings before the commerce commission, which resulted in the foregoing orders, the defendant denies that it had failed and neglected, since the issuance thereof, to furnish to the commission, and to print, post, and file, schedules showing the rates fixed and charges established by it for round-trip passenger excursion tickets issued by it, as required by law, or even as required in and by the said order of the commission. It admitted that it had not ceased and desisted from charging rates for transportation over its lines for a number of passengers traveling together in one party upon one ticket, which are less for each person of such party of ten or more than rates contemporaneously charged by it for transportation of single passengers between the same points. The particular instances of the issuance by it of such "party-rate" tickets set out in the bill were admitted to be substantially true. Respondent, however, denies that said "party-rate" tickets for ten or more persons traveling together as one party constituted any unjust discrimination, or are in violation of the law, and insists that, so far as said order of the commission enjoins and requires it to desist from the issuance of such "party-rate" tickets at less rates than are contemporaneously charged for single passengers between the same places, it is alleged that respondent has not complied and should not be required to comply therewith, because it rests upon an improper finding that said "party-rate" tickets are not "commutation passenger tickets" within the true meaning of section 22 of said act to regulate commerce, because it is based upon an erroneous construction of said act, and because it was beyond the power of the commission to make it.

After referring to the general practice on the part of railroads, before the passage of the act to regulate commerce, of issuing special rate passenger tickets of various kinds and forms, such as mileage, excursion, party, monthly, or quarterly, a specified number of trips for one person, or one trip by the specified number of persons, and ten, twenty, or thirty trip tickets, lower than the regular single fare charges, based upon the principle that when the amount of travel thereby encouraged or developed would more than make up to the carrier for the reduction of the *per capita* rate, then such special rate was reasonable and just in the interests of both the carrier and the public, the respondent proceeds to state "that since the passage of said act to regulate commerce this respondent has continued as theretofore the practice above stated of making a lower charge on passenger travel in consideration of the amount and frequency of travel, and with that purpose, and to accommodate the various classes of passengers, it has continued in use all the forms of ticket described in the next preceding section; that the charge fixed by it for the transportation of parties of ten or more on a single ticket has been two cents per mile *per capita,* which is the same rate charged on thousand-mile

tickets, and is a higher rate than it charges on long-distance passenger travel, and excursions, and higher than its general rates for suburban travel, on time or other suburban tickets; that the said charge for the transportation of parties on a single ticket is just and reasonable, affording a fair compensation to the carrier, and for the best interests both of the carriers and of the public, because any higher rate would destroy the business; that the business reasons, circumstances, and conditions which induce respondent to make such lower charge for the transportation of parties as aforesaid, and that make it the interest of this respondent as a carrier to make such lower charge, are precisely the same reasons, circumstances, and conditions that induce it and make it its interest to fix a lower charge for transportation of passengers buying mileage tickets, time or trip tickets, and excursion tickets; that, while so called 'party-rate' tickets are used principally by traveling amusement companies, because no other form of ticket meets the requirements of such companies, yet this respondent has avoided confining such tickets to any class of business, by offering them on the same terms to the public at large; that this respondent has obviated the danger that such lower charge for parties might be taken advantage of by speculators or ticket brokers, by issuing only one ticket for the whole party; and respondent avers that as such tickets are now issued by it they are not and cannot be used for speculative purposes, and afford no opportunity for evading the law in the hands of ticket brokers. This respondent further avers that it may rightly and legally make a charge *per capita* for persons traveling on said party-rate tickets lower than its charge for a single passenger making one trip between the same points, the character, circumstances, and conditions of the service being substantially different, and that the making of such lower charge *per capita* to the members of the party makes or gives no undue or unreasonable preference or advantage to them, and subjects no person, company, firm, corporation, or locality, or particular description of traffic, to any undue or unreasonable prejudice or disadvantage in any respect whatever." The charge that defendant has neglected and refused to print and post its rates for round-trip excursion tickets after the issuance and service of the commission's order, was denied by respondent, was unsustained by proof, and was practically abandoned at the hearing. It is therefore unnecessary for the court to express any decided opinion upon the question, as to which we have considerable doubt, whether a railroad company's rates on mileage, excursion, or commutation passenger tickets, or other special rates allowed by section 22 of the act to regulate commerce, are required to be printed and posted in its offices and furnished the commission in conformity with section 6 of said act. Under section 22 of the act as originally passed, it was declared "that nothing in this act (including section 6) shall apply to the * * * issuance of mileage, excursion, or commutation passenger tickets." The section, as amended by the act of March 2, 1889, provides "that nothing in this act shall prevent * * * the issuance of mileage, excursion, or commutation passenger tickets." How far this change of phraseology operates to bring such tickets within the provision of sec-

tion 6 of the statute, so as to require railroad companies to post their rates for such tickets, is by no means free from difficulty and doubt. But as the determination of the point is not necessary to a decision of the case before us, we do not deem it proper to pass upon it.

The real controversy in this case is confined to the validity of the commission's order requiring the defendant to desist from the issuance of "party-rate" tickets for ten or more persons traveling together on one ticket at a lower rate per mile and *per capita* than is contemporaneously charged for a single passenger between the same stations.    This issue represents two leading and important questions, which involve the proper construction of sections 1, 2, 3, and 22 of the act to regulate commerce, under the facts established by the pleadings and evidence: *First*, Are the "party-rate" tickets in use by defendant embraced or included in the general designation of "commutation passenger tickets," which section 22, as amended by the act of March 2, 1889, does not "prevent" the railroad company from issuing? And, *secondly*, if such "party rates" are not "commutation passenger tickets" within the true meaning of said section, do they constitute either an unjust discrimination, as defined and prohibited by section 2, or an undue or unreasonable preference or advantage, as forbidden by section 3, of said act?

The last clause of section 1 of the act to regulate commerce, adopted and established for the United States, in respect to interstate traffic, the general rule of the common law that all charges made by common carriers, subject to the provisions of said act, for any service rendered in the transportation of passengers or property, should be "reasonable and just," and that every "unjust and unreasonable" charge for such service should be prohibited and declared unlawful.    No claim is made that defendants charges for parties of ten or more or for single passengers have violated the provisions of said section.    The report and opinion of the commission does not find that the rates in use by defendant for either "party-rate" or single passenger tickets are in any way unjust or unreasonable charges for the services rendered in transporting either class; and the proof before this court establishes that said "party-rates" of two cents per mile are reasonable and just, that they are promotive of the interests of the railway companies issuing them, and a convenience to the public. The right of the defendant to make and collect reasonable charges for its transportation service is a property right under its franchises, of which it cannot be deprived without due process of law.    This is settled by the recent decision of the supreme court in the case of *Chicago, Milwaukee & St. Paul Ry. Co.* v. *State of Minnesota*, 10 Sup. Ct. Rep. 462.

In considering the foregoing questions, on which the proper determination of the present case rests, the fact established by the proof, and not controverted by or on behalf of complainant, that defendant's charges for both the single passenger and the party of ten or more are reasonable and just in themselves, should be kept in view.    Do "party-rate" tickets come fairly within the letter and spirit of the general terms "commutation passenger tickets," as used in section 22 of the statute?.    Railroad experts, many of whom were examined in this case, differ considerably

when they undertake to give an exact, technical definition of the words "commutation passenger tickets." Their testimony, however, shows that prior to the passage of the interstate commerce act railroad companies were in the constant habit of issuing a variety of special-rate tickets, such as mileage, excursion, monthly or quarterly, family, school children, twenty or fifty trips, good for the specified number of trips by one person or for one trip by the specified number of persons, round-trip and party tickets for ten or more persons traveling together on a single ticket, either one way or for the round trip, and that all these different classes and forms of tickets come within the designation or general description of "commutation" tickets, or "commutation" rates. This prevailing practice of the common carriers before the passage of said act, and which has been continued by many, if not by most, of them since the act went into effect, may properly be looked to in placing an interpretation upon the words "commutation passenger tickets" which follow, and were manifestly intended to enlarge the special classes covered by the "mileage" and "excursion" passenger tickets. After enumerating two varieties of special-rate tickets under the heads of "mileage" and "excursion," which come within the commutation principle, the language is broadened by the addition of the general terms "or commutation passenger tickets," thereby clearly indicating an intention on the part of congress to allow, or not to prevent, the continuance of the general practice of common carriers to adapt their rates and charges to meet the wants and convenience of the different classes of the community while developing and enlarging their traffic. The proof before the court fails to show that mileage and excursion tickets differ in any essential particular from "commutation passenger tickets," so as to make them a different class of tickets from the latter. On the contrary, the evidence establishes that they are particulars of the general class covered by the more comprehensive terms of commutation tickets or fares, which we think defendant's witness William B. Shattuc has most correctly and properly defined in saying that "a commutation ticket is a ticket for one passenger, good for more than one ride, or for more than one passenger for one ride, sold at a reduced rate." When, therefore, the particular classes of tickets (mileage and excursion) falling within the commutation principle, are followed by the general terms " or commutation passenger tickets," this latter clause of the sentence, upon no sound rule of construction, should be taken or treated as presenting something in contrast with or differing in character from the previously enumerated particulars, but should rather be regarded and interpreted as enlarging such particulars, so as to make the statute cover the whole subject of commutation tickets or rates, in all their variety of forms and classes, as were then in use by common carriers subject to the act, provided only that such charges were reasonable and just. It is clearly shown by the proof that the same business reasons, considerations, circumstances, and conditions which induce the most enlightened railroad management, having due regard both to the interests of their lines and to the convenience of the public, to make reduced rates on mileage, excursion, long distances, round trip,

time trip, or specified number of trip tickets, apply in all their force to "party-rate" tickets for ten or more persons traveling together in one body on a single ticket. Reduced rates to these several classes or descriptions of passenger traffic rest upon the same general principle, which the act to regulate commerce nowhere calls in question, that common carriers may rightfully so adjust their charges as to encourage and develop travel; that the amount or volume of such traffic is a legitimate element to be considered in determining what reduction should be made over local or ordinary rates, so as to make both correspond with the cost of service and the fair profit which the carrier is entitled to earn from each class of travel. Quantity of traffic affects both the costs of service and the legitimate profit which may be demanded for such service. When the profit on frequency of trips or on larger numbers transported at reduced rates reasonably corresponds with the fair profit of the carrier on a single trip, or smaller number transported at the ordinary higher rate, the carrier making such an adjustment of its charges with a view of encouraging and developing its legitimate business is only putting into practice the reasonable and well-settled business principle of every avocation or trade, which recognizes quantity, whether arising from the number or size of the transactions, as a proper element in the consideration and adjustment of the price. No complaint was ever made against common carriers acting upon this principle. The complaint made against them, and which the act to regulate commerce sought to remedy and correct, was the practice of showing favoritism and partiality between their customers or localities under the same or substantially the same circumstances and conditions. The act to regulate commerce does not undertake to deal with the subject of rates for transportation services, or with the business considerations which may influence common carriers in so adjusting them as fairly to increase their revenue, while paying due regard to the convenience of the public, any further than to declare the general principle that such rates shall be reasonable and just, shall be free from unjust discrimination, and shall confer no undue or unreasonable preference or advantage, nor impose any undue or unreasonable prejudice or disadvantage. Subject to these conditions and limitations, the act does not, and was not intended to, restrict the common-law right and power of common carriers to make special contracts, or adjust their rates with reference to existing wants and circumstances, so as to promote their own interests, while affording all proper and reasonable facilities and conveniences to the public. Subject to the above conditions, the act intended to leave the adjustment of rates as absolutely and completely in the discretion of the carrier as it existed at common law, which never questioned or denied to common carriers the right to give or make lower rates, based on increased quantity or amount of service. No case arising under the English railway acts of 1845, 1854, and 1873, so far as we have been able to find after careful examination, has ever called in question or impeached the right of carriers to fix rates and issue tickets based upon the consideration of the amount or volume of the traffic, nor disputed the reasonableness and sound business propriety

of railroad companies granting reduced rates to parties traveling often, or furnishing increased traffic in the way of numbers. On the contrary, their right so to regulate and adjust their rates is universally recognized. While the English statutes relating to railway traffic embody the same general principles, and seek to accomplish the same leading objects, as our act to regulate commerce, they contain no such affirmative provision or declaration as found in section 22, excluding from the operation of the law the enumerated general and particular cases in which special rates were not intended to be prevented or interfered with. Said section 22 should be regarded as a legislative declaration that not merely mileage and excursion, but passenger tickets generally, based upon the commutation principle of conceding a reasonable deduction from regular local rates in consideration of the frequency or quantity of the traffic, if reasonable and just in their charges, did not come within the evils so to be remedied. To contend that a "party-rate" ticket to ten or more persons traveling together on a single ticket at reduced rates per mile does not come within the reason or principle of commutation tickets, which are generally issued for only one way, because generally needed for only one direction, while admitting, as counsel for complainant does, that a round-trip ticket for ten or more persons, traveling together at the same reduced rate, would be considered as coming within the meaning of a commutation ticket as explained by complainant's expert witnesses, is drawing a distinction without any substantial difference. It rests upon no reasoning, involves no public policy or convenience, and is altogether too narrow and refined, to suppose that congress intended to make any such nice discriminations in the language employed to express, in a general way, what the law was intended not to prevent.

The commission seems to have treated and construed section 22 as designating certain cases and instances of discrimination which are to be considered as exceptions, and which, but for being so excepted, would fall within the operation of sections 2 and 3 of the act; and that, because "party-rate" tickets are not specially and particularly named, they should be excluded from the list of exceptions. We cannot, in view of the whole scope and manifest purpose of the act, assent to this construction of said section. It should be given a broader and more liberal interpretation for the reasons already stated, and, as thus interpreted, we think that the section fairly recognizes, in respect to passenger traffic, the general principle of commutation, and that "party-rate" tickets for ten or more persons traveling together in one body on one ticket at reduced rates per mile, which are reasonable and just, as issued by defendant, are within the letter and spirit of "commutation passenger tickets" as those terms are employed in the statute. This construction of the section neither disregards the duties and obligations of the carrier to the public, nor ignores its just rights in the reasonable management of its business. The evidence before us shows that, if "party-rate" tickets, as described and used by defendant, cannot be lawfully issued, or should be discontinued, the revenues of common carriers derived from passenger traffic will be seriously impaired, while the convenience and benefit

to the public, traveling in parties or bodies of ten or more, such as amusement companies, associations, clubs, organizations, delegates, and representatives attending conventions, religious, educational, or political, will at the same time be greatly interrupted and prejudiced. Our conclusion on the first question presented is that said "party-rate" tickets as used by defendant are "commutation passenger tickets" within the true meaning of section 22 of the act to regulate commerce.

*Secondly.* But suppose it be assumed that the defendant's "party-rate" tickets are not commutation tickets, as ruled by the commission, then the question remains whether they constitute an unjust discrimination, as defined by section 2, or an undue or unreasonable preference or advantage to, or any undue or unreasonable prejudice or disadvantage against, any particular person, company, firm, corporation, or locality, or any particular description of traffic in any respect whatsoever. The evidence discloses that originally " party-rate " tickets were issued only to theatrical or amusement companies, just as mileage tickets were to commercial travelers only; that since the passage of the interstate commerce act said " party-rate" tickets are no longer confined to one class of passenger traffic, but, like mileage, time-trip, and excursion rates, are regularly scheduled and posted, and offered to the public at large, so that any and all parties of ten or more traveling together, who choose to apply for the same, have equal rights and privileges of securing such tickets at the same reduced rates. Does this concession to the public, traveling in parties of ten or more, and open indiscriminately to all persons of the requisite number who choose to avail themselves of the reduced rate by applying for a single ticket for the party, violate, in letter or spirit, the provisions of either section 2 or 3 of the act? In other words, may the defendant lawfully transport a party of ten or more persons on a single ticket at a less rate per mile and *per capita* than it charges for carrying a single passenger between the same stations? Does the fact that defendant charges the single passenger for a single trip a somewhat higher rate per mile than it charges for transporting ten or more passengers as one party on a single ticket over the same distance, constitute unjust discrimination, as defined in section 2, or undue or unreasonable preference or advantage in favor of such party of ten or more, or any undue or unreasonable prejudice or disadvantage against the single passenger as prohibited by section 3 of the act? The decision of this question involves the proper construction and interpretation of said sections, which must be read and considered in connection with the provisions found in sections 1 and 22 in order to arrive at their true scope and meaning. When thus considered, it is perfectly manifest that congress did not intend to impose upon common carriers, subject to the provisions of the act, any rule or duty of absolute equality of rates in their charges for transportation services. Subject to the requirement of section 1, that all charges made for any service rendered in the transportation of passengers or property shall be reasonable and just, the language of section 2 clearly recognizes and implies that there may be discriminations which are not unjust and not prohibited. So, too, the language employed in

section 3, declaring it unlawful to make or give any "undue or unreasonable preference or advantage" to any particular person, etc., or to subject the same to any "undue or unreasonable prejudice or disadvantage," clearly implies that there may be a preference or advantage on the one hand, or a prejudice or disadvantage on the other, which is not undue or unreasonable, and therefore not in contravention of the law.   To be within the statute the discrimination must be "unjust," and the preference or prejudice must be "undue" or "unreasonable."   The discrimination which is declared "unjust" is the charging and collecting, directly or indirectly, from any person or persons a greater or less compensation for any service rendered in transporting passengers or property than is charged, collected, or received by the carrier from any other person or persons for doing for him or them a like and contemporaneous service in the transportation of like traffic, "under substantially similar circumstances and conditions."   When the traffic is not of like kind, or when the service is not "alike and contemporaneous," or when the transportation is not rendered "under substantially the same circumstances and conditions," differences in charges do not constitute "unjust discrimination."   The evil which said sections intended to remedy was the prevailing practice of railroad companies of favoring or showing partiality in the matter of charges to one person, firm, company, or locality as against another person, firm, company, or locality, for like and contemporaneous services rendered under the same or substantially the same circumstances and conditions.   Said sections were intended to prohibit favoritism and partiality in traffic rates, where the circumstances and conditions were substantially similar and the service contemporaneous.   Persons in like situations, requiring or desiring like and contemporaneous service on the part of carriers, were to be treated, in the matter of rates, impartially. This is expressed both affirmatively and negatively in the language of section 3.   The carrier shall not give any undue or unreasonable preference or advantage to or in favor of any particular person, company, or traffic, nor subject any particular person, company, or traffic to any undue or unreasonable prejudice or disadvantage.   These words necessarily involve the idea or element of comparison of one service or traffic with another similarly situated and circumstanced, and require that, to be undue and unreasonable, the preference or prejudice must relate and have reference to competing parties, producing between them unfairness and an unjust inequality in the rates charged them respectively for contemporaneous service under substantially the same circumstances and conditions.   In determining the question whether rates give an undue preference or impose an undue prejudice or disadvantage, consideration must be had to the relation which the persons or traffic affected bear to each other and to the carrier.   When and so long as their relations are similar or "substantially" so, the carrier is prohibited from dealing differently with them in the matter of charges for a like and contemporaneous service.   It thus appears that the intention of congress, as expressed in sections 1, 2, and 3, was to secure two leading objects, or effect two main purposes, viz.:   *First*, to establish, and impose upon

railroad companies engaged in interstate commerce, the duty of conforming to the general rule of the common law in making their charges for transportation services rendered reasonable and just; and, *second*, to prevent unjust inequality, partiality, favoritism, or unfairness, so far as concerned their charges for contemporaneous transportation services, as between persons, traffic, or localities similarly circumstanced. When the carrier's charges are in themselves unjust and unreasonable, the public is injuriously and unduly prejudiced, and put at disadvantage, and the commission may on behalf of the public, upon complaint made by any one, investigate such charges, and order their correction, subject to the right of the carrier to a judicial determination of the question whether or not its charges are reasonable and just. When the qualified requirement of impartiality in charges as between persons, traffic, or localities similarly circumstanced is disregarded or violated by. the carrier, the prejudice or disadvantage is personal or local, and the party or locality injured by the undue preference or the undue disadvantage can alone make complaint or institute proceedings for its correction and for proper redress.

Now, it is neither claimed nor proved in the present case that defendant's charges, either for single passenger or "party-rate" tickets, are in themselves unjust and unreasonable. On the contrary, both rates are shown to be just and reasonable. The public has, therefore, no ground of complaint on that score, nor has any legitimate complaint been made on its behalf, either by the original petitioner or by the commission. Who is unjustly discriminated against by defendant's difference in charges for the party of ten or more and the single passenger? Who is given an undue preference or advantage, or subjected to an undue prejudice or disadvantage, by reason of said difference in rates? If any one, it is manifestly the single passenger. But no complaint of undue prejudice or disadvantage and of consequent personal injury comes from that quarter. When this court is called upon, either by the commission or others, to enforce the provisions of the act to regulate commerce, it is indispensably necessary to show either a case of individual grievance or of public inconvenience resulting or arising from acts of the carrier done in violation of the statute. The proceeding in this case is not based upon any individual injury, but rests upon the alleged inconvenience to and undue prejudice against that portion of the public represented by the single passenger traffic in being charged by defendant a somewhat higher rate per mile than it demands and receives of and from a party of ten or more purchasing a single ticket for the party. But how can this position be sustained, if, as we have already stated, both single passengers and "party-rate" charges in use by defendant are in themselves "reasonable and just" towards each class of such traffic? When a carrier's charges are "reasonable and just" in compliance with the requirement of section 1, how can they be regarded or treated as constituting an unjust discrimination under section 2, or an undue preference or undue prejudice under section 3, of the act? The provisions of sections 2 and 3 were certainly not intended to restrict or qualify the rights conceded,

and the duty imposed by the first section of making charges "reasonable and just."

In the case of *Attorney General* v. *Birmingham, etc., Ry. Co.*, 2 Eng. Ry. Cas. 124, a railway company (whose act contained an equality clause) charged a smaller fare to passengers who traveled from D. to N., intending to proceed from N. to London by another railway, than they charged passengers from D. to N. who had no such intention.   On motion for an injunction it was held by Lord Chancellor COTTENHAM that the equality clause was meant only to prevent the exercise of a monopoly to the prejudice of one passenger or carrier and in favor of another, and that, even if he had jurisdiction to interfere, he would not do so unless it was clear that the public interest required it; and, it being admitted in the case that the higher charge was not more than the act authorized, it did not appear that the public were prejudiced by the arrangement.

· In the present case, it being neither claimed nor shown that the higher charge of three cents per mile for the single passenger on a single-trip ticket is unjust and unreasonable, or more than the defendant is authorized to charge by section 1, it is difficult to see in what respect the public are prejudiced or unjustly discriminated against by the arrangement.

But, aside from this view of the subject, in what respect does the difference which defendant makes in the rate charged the single passenger and the party of ten or more traveling together on a single ticket conflict with the provisions of sections 2 and 3 of the act?   Under the flexible and elastic rule prescribed by said sections, construed in the light of section 1, a difference in charges, while an element in the proper definition of unjust discrimination or undue preference, is by no means the sole or controlling factor.   To come within the inhibition of said sections the differences must be made under like conditions; that is, there must be contemporaneous service in the transportation of like kinds of traffic, under substantially the same circumstances and conditions.   In respect to passenger traffic, the position of the respective persons or classes beween whom differences in charges are made must be compared with each other, and there must be found to exist substantial identity of situation and of service, accompanied by irregularity and partiality, resulting in undue advantage to one or undue disadvantage to the other, in order to constitute unjust discrimination.   The sections substantially adopt the principle laid down in *Hays* v. *Pennsylvania Co.*, 12 Fed. Rep. 309, where the court, after stating that a common carrier had no right to make unreasonable and unjust discriminations, said:

"But what are such discriminations?   No rule can be formulated with sufficient flexibility to apply to any case that may arise.   It may, however, be said that it is only where the discrimination inures to the undue advantage of one man in consequence of some injustice inflicted on another that the law interferes for the protection of the latter."

It cannot be properly said in the case under consideration that the lower rate given to a party of ten or more confers upon such party an undue advantage in consequence of injustice inflicted upon the single passenger.   There is nothing competitive in the traffic of the single pas-

senger and the party of ten or more, which would make lower rates to the latter operate prejudicially to the former. It is well understood that the cost of transportation service to the carrier decreases as distance increases, as trips are multiplied, and as the numbers transported are enlarged. It costs the carrier less proportionately to transport a party of ten or more than it does a single passenger. The carrier is entitled to a fair profit for its services, and when the profit derived from the larger number carried at reduced rates reasonably corresponds with that resulting from the carriage of an individual at a somewhat higher rate, what unjust discrimination is made, or in what respect is the individual subjected to undue prejudice or disadvantage? A single passenger desiring or proposing to make ten or more separate trips may procure a ticket for the designated number of trips at rates lower per mile than are charged the single passenger on a single-trip ticket between the same points. Has it ever been held that this would operate to confer an undue advantage upon the one, or subject the other to undue disadvantage? A passenger on a through ticket from New York to Cincinnati travels at a lower rate per mile between Pittsburgh and Cincinnati than is charged the passenger traveling only between said places. The two may travel on the same train and in the same car, but the difference in the rates each is paying over the same distance is not unjust discrimination or undue preference, because the service is not identical. *Railway Co.* v. *U. S.*, 117 U. S. 355–363, 6 Sup. Ct. Rep. 772. But what is the real underlying principle which sanctions and justifies the differences in charges in such cases? It is that the carrier may make reasonable concession in the way of reduced rates in consideration of longer service and of more frequent trips. The reason and the principle equally apply to an adjustment of rates based upon numbers transported. What difference or distinction is there between transporting a single passenger a given distance at reduced rates, as compared with the single-trip rates, in consideration of his making ten or more trips, and the transportation of ten or more persons traveling together on a single ticket over the same distance on one trip at the same reduced rates? There being no competitive relation between the single passenger and the party of ten or more, the relative cost of service in their transportation being different, the profit derived from one fairly corresponding with that received from the other, and the inducement on the part of the carrier for making the reduction in favor of party rates being the development and maintenance of a class of traffic which the evidence shows cannot and will not stand a higher rate than two cents per mile, we cannot properly compare the single passenger with the party class of ten or more, nor find that the reduced charges allowed the latter constitute, under the circumstances, undue preference in favor of such parties, or undue prejudice against the single individual. Subject to the two leading prohibitions that their charges shall not be unjust and unreasonable, and that they shall not unjustly discriminate, so as to give undue preference or advantage, or subject to undue preference or disadvantage persons or traffic similarly circumstanced, the act to regulate commerce leaves common carriers as

they were at common law, free to make special contracts looking to the increase of their business, to classify their traffic, to adjust and apportion their rates so as to meet the necessities of commerce, and generally to manage their important interests upon the same principles which are recognized as sound, and adopted in other trades and pursuits. Conceding the same terms of contract to all persons equally, may not the carrier adopt both wholesale and retail rates for its transportation services? In *Nicholson* v. *Railway Co.*, 1 Nev. & McN. 147, which involved the "undue preference" clause of the act of 1854, ERLE, C. J., said:

"I take the free power of making contracts to be essential for making commercial profit. Railway companies have that power as freely as any merchant, subject only (as to this court) to the duty of acting impartially without respect of persons; and this duty is performed when the offer of the contract is made to all who wish to adopt it. Large contracts may be beyond the means of small capitalists; contracts for long distances may be beyond the needs of those whose traffic is confined to a home district; but the power of the railway company to contract is not restricted by these considerations."

It will be seen from an examination of the English railway traffic acts of 1845 and 1854 that section 90 of the former and section 2 of the latter were substantially adopted and embodied in sections 2 and 3 of our act to regulate commerce. Section 90 of the English act of 1845 required that " tolls were at all times (to be) charged equally to all persons and after the same rate, whether per ton, per mile, or otherwise, in respect of all passengers and of all goods and carriages of the same description * * * passing only over the same portion of the line of railway under the same circumstances ; and no reduction or allowance in any such tolls should be made, either directly or indirectly, in favor of or against any particular company or person traveling upon or using the railway." Section 2 of the act of 1854, after requiring every railway company subject to the law to afford all reasonable facilities, according to their respective powers, for receiving, forwarding, and delivering of traffic, provided that "no such company shall make or give any undue or unreasonable preference or advantage to or in favor of any particular person or company, or any particular description of traffic, in any respect whatsoever; nor shall any such company subject any particular person or company, or any particular description of traffic, to any undue or unreasonable prejudice or disadvantage in any respect whatsoever." The English cases upon the question of "undue preference" which have arisen under said sections will be found to confirm the construction we have placed upon sections 2 and 3 of the act, and also show the elements which may properly be considered in determining whether " undue preference" has been given or " undue disadvantage" has been imposed. The history and bearing of the equality clause of the act of 1845 is elaborately discussed by BLACKBURN, J., in the case of *Railway Co.* v. *Sutton*, L. R. 4 H. L. 238, 38 L. J. Exch. 177. With respect to the " undue preference" forbidden by section 2 of the act of 1854, which was a mere enlargement of section 90 of the act of 1845, the English cases, stated generally, hold that a preference to be

"undue" must be a preference of a person similarly circumstanced and bringing a similar profit to the company. In *Hozier* v. *Railway Co.*, 1 Nev. & McN. 30, where the passenger rates between certain stations were complained of as constituting undue preference, the lord president said: "It [the act] provides for giving undue preference to parties *pari passu* in the matter, but you must bring them into competition in order to give them an interest to complain." In *Jones* v. *Railway Co.*, Id. 45, the undue preference complained of was a preference given to the inhabitants of Harwich over those of Colchester in the matter of season tickets, lower rates being conceded to the former on longer distance than was allowed to the latter; but the court held that the difference did not constitute a case of "undue preference" within the act. In the cases of *Painter* v. *Railway Co.*, 2 C. B. (N. S.) 702, and *Ex parte Ilfracombe Public C. Co.*, Wkly. Notes, (1868,) 289, it was said that regard must be had to the general conveniences of the public, rather than to the wishes or interests of individuals, and that it must be clearly shown that the course complained of occasioned some substantial injury or inconvenience to the public. In case of *Ransome* v. *Railway Co.*, (No. 1,) reported in 1 C. B. (N. S.) 437, 26 Law J. C. P. 91, CRESSWELL, J., in considering the meaning of the expressions "undue or unreasonable preference or advantage," and "undue or unreasonable prejudice or disadvantage," says:

"Are these words to be construed with reference to the interests of the parties using the railway only? or may the interests of the railway owners be taken in any manner into consideration? *Ex. gr.*, if 1,000 tons can be carried for a lower sum per ton per mile than 100 tons, yielding an equal profit per ton to the railway company, may they so regulate the charges as to derived such equal profit? Would the lower rate charged for the larger quantity give an undue preference? * * * If that may be done without giving what the statute calls an undue or unreasonable preference, may not the company, in fixing rates, consider the whole profit, and not the mere profit per mile, and, in order to induce people to carry more on their lines, and longer distances, agree to make a reduction in such case? It is true that the sender of the smaller quantities for a shorter distance will pay more per mile and more per ton in the respective cases, but will that be an undue or unreasonable prejudice or disadvantage? * * * After a good deal of consideration, we think that the fair interests of the railway ought to be taken into the account, and then the question suggested assumes a very complicated and difficult character."

In *Oxlade* v. *Railway Co.*, 1 C. B. (N. S.) 454, 26 Law J. C. P. 129, it was held that a railway company was justified in carrying goods for one person at a less rate than that at which they carried the same description of goods for another, if there were circumstances which rendered the cost to the company of carrying for the former less than the cost of carrying for the latter. In *Nicholson* v. *Railway Co.*, 5 C. B. (N. S.) 435, 28 Law J. C. P. 89, it was held to be competent for a railway company to enter into special agreement, whereby advantage may be secured to individuals in the carriage of goods, where it appeared that, in entering into such agreement, the company had only the interests of the proprietors and the legitimate increase of the profits of the railway in view,

and the consideration given to the company in return for the advantage afforded by them was adequate, and the company were willing to afford the same facilities to all others upon the same terms.    In *Bellsdyke Coal Co.* v. *North British Ry. Co.*, 2 Nev. & McN. 105–110, it was said by the court that "a railway company pays no more than a due regard to its own interests if it charges for its services in proportion to their necessary cost, and has only such variation in its rates as there is in the circumstances of its customers."    In *Baxendale* v. *Railway Co.*, (Reading case,) 5 C. B. (N. S.) 336, 28 Law J. C. P. 81, COCKBURN, C. J., after stating that if it were made to appear that the disproportion (in rates) was not justified by the circumstances of the traffic, the court would interfere, proceeds as follows:

"So, again, if an arrangement were made by a railway company whereby persons bringing a larger amount of traffic to the railway should have their goods carried on more favorable terms than those bringing a less quantity, although the court might uphold such an arrangement as an ordinary incident of commercial economy, provided the same advantages were extended to all persons under the like circumstances, yet it would assuredly insist on the latter condition."

And, while recognizing the duty on the part of the court to redress any injustice or inequality prohibited by the law, he makes the further pertinent observation:

"At the same time we must carefully avoid interfering, except where absolutely necessary for the above purpose, with the ordinary right (subject to the above-named qualifications) which a railway company, in common with every other company or individual, possesses, of regulating and managing its own affairs, either with regard to charges or accommodation as to the agreements and bargains it may make in its particular business."

As regards the "undue preference" branch of the English acts, "the effect of the decisions seems to be that a company is bound to give the same treatment to all persons equally under the same circumstances; but that there is nothing to prevent a company, if acting with a view to its own profit, from imposing such condition as may incidentally have the effect of favoring one class of traders, or one town or one portion of their traffic, provided the conditions are the same to all persons, and are such as lead to the conclusion that they are really imposed for the benefit of the railway company."    Report of Amalgamation Committee of 1872, p. 13.    Our act to regulate commerce having adopted substantially sections 2 and 90 of the English railway traffic acts of 1854 and 1845, the settled construction which the English courts had given to their terms and provisions must be received as incorporated into our statute.    *McDonald* v. *Hovey*, 110 U. S. 619, 4 Sup. Ct. Rep. 142.    The English cases referred to above, and others that might be cited, establish the rule that, in passing upon the question of undue or unreasonable preference or disadvantage, it is not only legitimate, but proper, to take into consideration, besides the mere differences in charges, various elements, such as the convenience of the public, the fair interest of the carrier, the relative quantities or volume of the traffic involved, the relative cost of the services and profit to the company, and the situation and circum-

stances of the respective customers with reference to each other, as competitive or otherwise. The English decisions cited, and the case of *Denaby Main Colliery Co.* v. *Manchester, etc., Railway Co.*, L. R. 11 App. Cas. 97, 55 Law J. Q. B. 181, further establish that the burden of proving the undue preference or the undue prejudice rests upon the complaining party. In the latter case, the Earl of Selborne, after referring to the objection that it was not shown by the carrier that the reduced rates corresponded with the reduced cost to the company, said:

"I do not find in the act that, when there is a real difference of circumstances, and nothing to show any want of good faith, the burden of justifying the exact difference of charge, (or, what is the same thing, the deduction or allowance,) by showing a numerical or ' necessary relation ' between it and the actual saving, is cast upon the company."

Section 27 of the act of August 10, 1888, (51 & 52 Vict. c. 25,) for the better regulation of railway and canal traffic, changed this rule by providing that, where inequalities in rates exist, "the burden of proving that such lower charge or differences in treatment does not amount to an undue preference shall lie on the railway company." As no such provision is found in our act, the burden of showing that the difference in defendant's "party" and single passenger rates constitutes undue preference in favor of the former, or undue prejudice or disadvantage against the latter, devolves upon the complainant, and must be established as the reasonable and legitimate result of the various elements on considerations above mentioned. There is no pretense or suggestion that there is any want of good faith in defendant's action, or that the difference in rates complained of was made or is continued with a view to any actual disadvantage of the single passengers, or to subject the public to any injury or inconvenience.

Subjecting defendant's rates for single passengers and for parties of ten or more traveling together on a single ticket to the test of the various considerations indicated above by the English decisions as elements in the question, does it clearly appear that such rates are so adjusted as to give an undue or unreasonable preference to one or impose an undue or unreasonable preference or disadvantage upon the other class? We think not. In view of the established facts that it is not claimed or shown that the single passenger rates are unjust and unreasonable, that the "party rates" are just and reasonable, that there is no competition or competitive relation between the two classes, that the "party rates," open to all who choose to avail themselves of the same, are a convenience and benefit to a considerable portion of the traveling public, that the interests of the carrier are reasonably promoted by their use, that the cost of service is relatively or proportionately less for the party of ten or more than for the single passenger, and that the difference in charges does not appear to be improperly adjusted with reference to or unjustified by the actual saving or profit to the company, it cannot be properly said that the traffic is of like kind, and that the service is identical, or "under substantially the same circumstances and conditions." The decisions of the state courts on the subject of unjust dis-

crimination, and the considerations that may be properly looked to in passing upon the question, are, we think, in harmony with the view above expressed, and with the conclusions reached. See *Ragan* v. *Aiken*, 9 Lea, 609; *Scofield* v. *Railroad Co.*, 43 Ohio St. 571, 3 N. E. Rep. 907; *Johnson* v. *Railroad Co.*, 16 Fla. 623; *McDuffee* v. *Railroad Co.*, 52 N. H. 430; *Killmer* v. *Railroad Co.*, 100 N. Y. 395, 3 N. E. Rep. 293; *Shipper* v. *Railroad Co.*, 47 Pa. St. 338; *Christie* v. *Railroad Co.*, 94 Mo. 453, 7 S. W. Rep. 567; *Bayles* v. *Railroad Co.*, (Colo.) 22 Pac. Rep. 341; and *Root* v. *Railroad Co.*, (N. Y.) 21 N. E. Rep. 403.

We think there is no force in the suggestion that "party-rate" tickets, as used by defendant, are more liable to abuse than ordinary or regular single passenger tickets. In the present case it is clearly shown by the evidence of railroad superintendents and experts, familiar with the subject, that such "party-rate" tickets are less liable to abuse than ordinary single tickets. It is manifest from a moment's reflection that the fewer the tickets on which the carrier's transportation services are arranged and conducted the better it can protect itself and the public against speculators and ticket brokers. It is also manifest that the larger the number of passengers embraced in a single ticket the greater will be the difficulty of "scalpers" or ticket brokers dealing therein. But, if the single tickets for parties of ten or more traveling together were liable to the abuses suggested, that fact would hardly control the proper construction of the law, nor tend to establish that their issuance at reduced rates constituted undue preference or advantage on the one hand, or undue or unreasonable prejudice or disadvantage on the other. Our conclusion upon the whole case is that "party-rate" tickets, as used by defendant, are not in contravention of sections 2 and 3 of the act to regulate commerce, and that the order of the commission requiring and enjoining the defendant to cease and discontinue the use of said tickets is not lawful, and should not be enforced by this court. It follows that the complainant's bill should be dismissed, with costs to be taxed. It is accordingly so ordered and adjudged.

SAGE, J., (*concurring.*) The bill is filed to enforce the opinion and order of the interstate commerce commission against the respondent, upon the complaint of the Pittsburgh, Cincinnati & St. Louis Railway Company, that the respondent had put into effect and had in operation so called "party rates," whereby parties of ten or more persons traveling together on one ticket were transported over its lines of road at two cents per mile *per capita*, the regular rate for a single person being about three cents per mile. The complaint was, further, that the respondent was in the habit of selling round-trip excursion tickets over its lines without publicly posting the rates therefor, which were less than rates for ordinary tickets. The respondent admitted the facts as alleged, but denied that they were in conflict with the law.

The bill contains, in substance, the averments of the complaint, with the further averment that the respondent, in disregard of complainant's order, and in violation of the act to regulate commerce, persists in doing each of the acts complained of, wherefore an injunction is prayed to

restrain the respondent from further continuing said disregard, under a penalty of.$500 for every day after a day to be named in the decree of this court.

The respondent admits the averment of fact in the bill relating to the sale and use of party-rate tickets, and justifies as in its answer to the complaint aforesaid, but denies that since the order made thereon it has failed or refused to post its rates for excursion tickets. No testimony was taken in support of the averments of the bill denied by the answer, and at the hearing this part of the complainant's cause was abandoned, leaving as the only questions to be decided those relating to the sale of party-rate tickets, as conducted by the respondent.

The facts are not in dispute. A single ticket is issued to a party of ten or more at the fixed rate of two cents per mile *per capita*, which is a reduction of about thirty-three and one-third per centum from the regular fare for a single person. This rate is scheduled, and posted, and open to the public at large. A question was made whether these tickets were known and recognized in railroad circles before and at the date of the passage of the act as "commutation tickets." The evidence of railroad men of experience and prominence was taken upon this point. It clearly establishes the negative of the proposition. Some of the witnesses went further, and undertook to settle, by their testimony, whether party-rate tickets are commutation tickets; but that is a question of construction, to be determined by the court, and not by witnesses. Whether they were, at and before the passage of the act, generally known and recognized by those engaged in railroad business as "commutation tickets," and how those words were then understood and used by railroad men, is competent, for the reason that the presumption is that congress employed terms used in that business in the sense in which they were so used. Construing the testimony according to this rule, my conclusion is that party-rate tickets are not included in the letter of the provision in favor of commutation tickets in the twenty-second section of the act. Their use was confined chiefly to traveling theatrical troupes. They were not on sale to the public. Although kept at the larger stations, they could not usually be obtained without an order from the general office, or from some authorized sub-office of the passenger department. They were not regarded as, nor understood to be, commutation tickets, nor are they such within the meaning of the word "commutation," which, as applied to railroad tickets, is defined by Webster to be "the purchase of a right to go upon a certain route during a specified period for a less amount than would be paid in the aggregate for separate trips." The Century Dictionary gives the following definition: "A ticket issued at a reduced rate by a carrier of passengers, entitling the holder to be carried over a given route a limited number of times, or an unlimited number during a certain period."

There is a general sense in which the party-rate ticket may be said to be a commutation ticket, although no more so than a mileage ticket or an excursion ticket. But the twenty-second section recognizes mileage, excursion, and commutation tickets each as distinct from the others, using the designations in their technical sense. The difference between commutation and

party-rate tickets is that commutation tickets are issued to induce people to travel more frequently, and party-rate tickets are issued to induce more people to travel. There is, however, no difference in principle between them, the object in both cases being to increase travel without unjust discrimination, and to secure patronage that would not otherwise be secured. The party-rate ticket is more like the excursion ticket, the apparent difference being that the excursion ticket is to return to the starting point; but, as the return is frequently over another line, so that the excursionist is not carried both ways over any portion of the entire route, the difference is not material. For the purposes of this opinion, however, the party-rate ticket will be regarded as separate and distinct from mileage, excursion, and commutation tickets.

It is claimed that section 22 makes certain exceptions from the operation of the act, specifying mileage, excursion, and commutation passenger tickets, and that, as party-rate tickets are not mentioned, and cannot be classed as commutation tickets, the inference, under a well-known rule of construction, is that congress intended to exclude them. Let us look into this matter. The first section of the act contains the general provision upon which the entire act is founded. It requires that all charges for the transportation of persons or property shall be reasonable and just, and prohibits every unjust and unreasonable charge. The provisions of the second, third, fourth, and fifth sections are specific, in the nature of definitions, and in aid of the provisions of the first section. In this case we have to deal particularly with the provisions of the second and third sections, which prohibit unjust discriminations, and undue and unreasonable preferences. The second section makes it unlawful, by any special rate or other device, to demand, collect, or receive from any person or persons a greater or less compensation for any service rendered in the transportation of persons or property than is charged, demanded, collected, or received from any other person or persons for a like contemporaneous service, in the transportation of a like kind of traffic, under substantially similar circumstances and conditions. The third section forbids any undue or unreasonable preference, in any respect whatsoever, to any particular person, company, firm, corporation, or locality, or any particular description of traffic; and to the same extent it forbids any undue or unreasonable prejudice or disadvantage. Now, it is to be observed at the outset that the act does not provide that there shall be no discrimination. The prohibition is against unjust discrimination, undue and unreasonable preference or advantage, and undue or unreasonable prejudice or disadvantage. Apparently recognizing, as the law has recognized, that discrimination, within just limits, is essential to the successful conduct of the business of the common carrier, as it is to the successful conduct of every other business, but, beyond those limits, destructive, congress attempted nothing more than to fix and enforce the limit; and this consideration furnishes the key to the proper construction of the act.

Now, let us turn to section 22. It is referred to as specifying exceptions to the operation of the act. But are they exceptions?

Did congress intend to say that certain unjust discriminations, and undue and unreasonable preferences and advantages,—that is to say, those mentioned in the twenty-second section,—should be excepted? What are they? Here is one of the first: "The free carriage of destitute and homeless persons transported by charitable societies." Would that be an unjust discrimination, but for the "exception" in its favor? Unjust to whom? Would it be less unjust to leave it to the other passengers to take up a collection and pay their fare, or submit to see them put off the train? "Nothing in this act shall be construed to prohibit any common carrier from giving reduced rates to ministers of religion, or to municipal governments for the transportation of indigent persons, or to inmates of the national or state homes for disabled volunteer soldiers, or of soldiers' and sailors' orphans' homes." Are these unjust discriminations, or undue or unreasonable preferences or advantages, and was the twenty-second section necessary to legalize them? These provisions seem to be rather by way of recognition that the free carriage and reductions referred to are returns, slight and inadequate indeed, but proper to be made by railroad companies, for the great franchises bestowed upon them without money and without price. Again: "Nothing in this act shall be construed to prevent railroads from giving free carriage to their own officers and employes." Can it be possible that without this provision it would be necessary for the president and directors of the company to provide themselves with tickets before starting out on a tour of inspection of the road, and that every conductor and locomotive engineer and fireman would have to pay full fare for every trip? Yet this follows logically if the twenty-second section is a section of exceptions. The analysis might be applied with like results to every specification contained in the section, but these will suffice. The language is "that nothing in this act shall prevent," and "nothing in this act shall be construed to prohibit,"—expressions evidently used interchangeably. The word "exception" is not to be found in the section, but there is the significant provision that "nothing in this act contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this act are in addition to such remedies," indicating that the act was understood by congress to be declaratory, and for the prevention of abuses and evasions of the unwritten law, which was adopted and incorporated into the statute that its construction and operation might be uniform throughout the land, and that it might be enforced by sanctions of federal legislation. Mileage, excursion, and commutation tickets are mentioned in the section. All these were universally regarded as just and necessary discriminations, but, mileage tickets especially, subject to abuse. No significance ought to be attached to the fact that party-rate tickets are not mentioned, for, as is above shown, they were not in general use, but were limited almost exclusively to traveling theatrical troupes.

The true construction of the section appears to be that it specifies certain discriminations, not regarded by congress as within the letter or the spirit of the act, and therefore it provides that the act

shall not be construed to prevent them; and the instances given are illustrative, rather than exhaustive. It is a section furnishing an express rule of construction. It follows that the maxim *expressio unius est exclusio alterius* does not apply, but that the true rule is to look to the section as a guide to the proper interpretation of the prohibitory clauses of the preceding sections, and exclude from their operation every discrimination which is within the principle of the particular cases mentioned in the twenty-second section. It is all wrong to cite it as authority for precisely such misconceptions and misconstructions as it was intended to prevent. Any construction which makes the statute a mere enactment of arbitrary rules, to be so administered as to force a rigid inflexible equality, is in conflict with the objects which its framers had in mind, and a constant obstacle to the further development of a vast system of transportation, in which new situations and conditions, continually occurring, and requiring new adaptations and regulations, can be moulded into harmony with the provisions of the act only by regarding it as declaratory of principles founded upon wisdom and experience, and to be made beneficial and effective by being so expounded as to apply those principles to every new case that may arise.

This case, then, depends upon the question whether party-rate tickets, as issued by the respondent, are, upon a proper construction, prohibited by the preceding sections. It is claimed that they are obnoxious to the first section, because they are not just and reasonable. While it is admitted that, if their issue be confined to parties of ten or more, the injustice would not be so apparent, it is urged that it would be left to the carrier to determine what number should make a "party," and that under the law, so construed, a reduced rate could be accorded to a party of two, as it is said was done before the act. The testimony on this point is that almost without exception ten was the smallest number of persons to whom they were issued. At one time, upon the Union Pacific Railroad, from the Missouri river to Colorado, they were issued to parties of two. It is explained, however, by the witness who testifies to this fact, that the concession was made for the benefit of variety people who traveled in pairs, but that the rate was more than three cents per mile. The one other exception testified to was made by the Wabash Railroad Company, which gave a reduced rate to four theatrical persons traveling as a party; but this reduction was granted to theatrical persons only. It appears in evidence, also, that before the law there were voluntary traffic associations, to which the leading railroad companies were parties, organized to prevent cutting of rates and undue competition. Party-rate tickets were then in vogue, and if, under those circumstances, the only departures from the rule of ten were those cited above, there would seem to be little ground for the apprehension expressed on behalf of the complainant that to permit the continued sale and use of these tickets would open the door to all the evils which formerly existed. But suppose, for the sake of the argument, that the apprehension be well founded, the answer is twofold: (1) It cannot be doubted that whenever the sale of party-rate tickets is by any means made a mere pretext for

evading the law,—as, to take the illustration put, when a ticket is issued to two at a reduced price, merely to cut rates,—the courts will so treat it, and apply the remedy. The suggestion that if railroad companies have the right to issue party-rate tickets to companies of ten or more persons, they may issue them to two, is like the old objection to the right of transit with slaves,—that if the master could hold his slave on free soil for an hour, he could for a day, or a year, and therefore for life,—which, although it puzzled many for a time, needed but a touch of common sense to explode it. (2) Nothing in the future of legislation is more certain than that whenever that abuse becomes prevalent the legislatures of the states will promptly reduce the individual rate to the same figure. The history of railroad passenger travel for the last forty years illustrates the constant tendency of special rates, including mileage, excursion, and commutation tickets, to reduce regular individual rates upon the one hand, especially for long distances, and, upon the other hand, to increase facilities and accommodations, thus rendering the service cheaper and better for the general public.

The next objection is that party-rate tickets are obnoxious to the second section of the act, because they furnish to one class of passengers transportation for lower compensation than is charged to others for like and contemporaneous service, under substantially the same circumstances and conditions; and to the third section, because they give to one class of passengers an undue and unreasonable preference and advantage.

If this objection be true in statement,—that is, if those traveling under party-rate tickets are charged less than individuals for like and contemporaneous service, under substantially the same circumstances and conditions,—it is conclusive, and the issuance of the tickets must be adjudged unlawful. But how do they compare with mileage tickets, which, by the twenty-second section, are declared to be in harmony with the act? The rate for each is two cents per mile. The coupons of mileage tickets are for two miles each, but they are sold in blocks of five hundred, or for one thousand miles. The holder can use them at pleasure, for long or short rides. He may ride for any distance within the limit of his ticket, in the same car, and occupy the same seat, with a passenger who is charged three cents per mile for his ticket. The holder of the mileage ticket is a wholesale purchaser; the other buys at retail. The difference is recognized in every kind of business, and no intelligent, fair-minded person thinks of complaining of it. The mileage ticket, so the testimony declares, is especially liable to abuse, and to be used by brokers for speculative purposes. The party-rate ticket, if not, as some witnesses testify, altogether unavailable for either purpose, is less so than any other ticket, and reduces the opportunity for either to the minimum. It, too, is a wholesale ticket. It is open to purchase to all, at the one fixed price. It has one peculiarly distinguishing feature,—it is almost proof against fraud upon the company which issues it. The purchaser having a party of less than the number named in his ticket may, unless restricted by the terms of his ticket, fill up his party from the outside. That he would have a right to do, provided they

all travel together, on the same train, as a party, and under the one ticket, for but one ticket is issued, and whoever of the party misses the train must buy an individual ticket at full rates, or lose the trip. Suppose a car-load of sixty persons be made up of passengers traveling on party-rate tickets, how much of the receipts from the sale of those tickets will fail to reach the treasury of the company? Not one dollar. Suppose the next car in the same train contains sixty passengers traveling on individual tickets, or cash fares. What would be the comparative percentage of opportunity in the two cases for peculation at the expense of the railroad company? If a perfect safeguard against such peculations could be provided all over the country, to what extent would it tend to reduce railway passenger fares, and to benefit railway shareholders? Again, the testimony establishes that party-rate tickets secure patronage that yields large revenues to the respondent, and that the withdrawal of those tickets would almost entirely destroy that patronage; for it appears that the rate is as high as can be made without putting it beyond the reach of those who are the main purchasers. Are all these considerations to be left out of the account in determining whether there has been "like and contemporaneous service" "under substantially similar circumstances and conditions?" Does it depend solely upon whether party-rate passengers and those holding single tickets occupy the same cars, have the same accommodations, and are traveling from the same point to the same destination? Is that the full meaning of "similar circumstances and conditions?" The answer—which the question itself seems to suggest—is that the phrase has a much larger and more comprehensive meaning, else congress could not consistently have recognized mileage or excursion or commutation tickets, for all these trespass upon the narrow ground on which the contrary view rests. To give the act its proper interpretation, the phrase must be held to include circumstances and conditions affecting the business interests of the carrier and of its patrons; or, in other words, circumstances and conditions of a commercial character, which, while they they should not exclude or override the consideration of what is just and reasonably advantageous to those not so situated as to be able to avail themselves of reductions offered to the general public, should be so recognized as not to be prejudicial or unjust to any, and yet, upon the whole, to promote the interest of all concerned in the beneficial operation of the act. Aside from the consideration that these tickets are in principle in no wise different from mileage, excursion, and commutation tickets, which is decisive, the fact that they are on sale to all, without discrimination, and without advancing rates for single tickets, and the considerations above mentioned in favor of those who are upon the road continually, and whose business is upheld by bringing the cost of necessary travel within their reach, and those in favor of the carrier, including many not mentioned above, are ample for the vindication of the respondent against the charge that it is guilty of unjust discrimination, and undue or unreasonable preference, and therefore of violation of the provisions of the second and third sections of the act.

The further objection is made that the sale of party-rate tickets is obnoxious to the fourth section, because it permits the carrier to charge and receive a greater compensation for the transportation, under substantially similar circumstances and conditions, of passengers holding single tickets for a shorter distance, than for the transportation of others holding a party-rate ticket for a longer distance; but this objection is fully met by the answers to the objections relating to the second and third sections. The bill should be dismissed at the costs of the complainant.