INTERSTATE COMMERCE COMMISSION v. CHICAGO GREAT WEST-
ERN RY. CO. et al. (two cases).

(Circuit Court, N. D. Illinois, E. D.   November 20, 1905.)

Nos. 27,723,  27,829.

1. CARRIERS—ACT TO REGULATE COMMERCE—ITS OBJECTS.
     The principal objects of the interstate commerce act were to secure just
     and reasonable rates; to prohibit unjust discriminations in the rendition
     of like service under substantially similar circumstances and conditions;
     to prevent undue or unreasonable preference to persons, corporations, or
     localities; to inhibit greater compensation for a shorter than for a longer
     distance over the same line; and to abolish combinations for the pooling
     of freight.

2. SAME—COMPETITION.
     The act to regulate commerce was not designed to prevent competition
     between different roads, but rather to encourage it.

3. SAME—SECTION 1 OF ACT TO REGULATE COMMERCE.
     Section 1 of the act to regulate commerce (Act Feb. 4, 1887, c. 104, 24
     Stat. 379 [U. S. Comp. St. 1901, p. 3154]) requires that all charges made for
     the transportation of property shall be reasonable; and the evidence
     shows that the rates in controversy in these cases are reasonable.

4. SAME—FACTORS TO BE CONSIDERED IN FIXING REASONABLE RATES—VALUE
     OF SERVICE TO THE SHIPPER.
     There are a great many factors and circumstances to be considered in
     fixing rates, and among other things is the value of the service to the ship-
     per, which includes the value of the goods and the profits which the shipper
     can make by having them transported from one point to another.   The
     evidence and authorities in the cases show that this method of rate making
     is not only ideal, but practical, when not interfered with by competition;
     and it is based on an idea similar to taxation.   Case cited:  I. C. C. v.
     B. & O. R. Co. (C. C.) 43 Fed. 37, 53.

5. SAME—COST OF SERVICE TO THE CARRIER.
     The evidence shows that the cost of service to the carrier would be an
     ideal theory for rate making; but it is not practical.   Such cost can be
     reached approximately, but not accurately enough to make this factor con-
     trolling.   It is, however, worthy of consideration and is a very important
     factor.   Cases cited:  I. C. C. v. B. & O. R. Co. (C. C.) 43 Fed. 37, 53;
     Ransome v. E. C. Ry. Co. (1857) 1 C. B. 437, 26 L. J. C. P. 91; Judson on
     Interstate Commerce, §§ 148, 149; W. U. Tel. Co. v. Call Pub. Co., 21 Sup.
     Ct. 561, 181 U. S. 92, 45 L. Ed. 765; I. C. C. v. D. G. H. & M. R. Co., 17
     Sup. Ct. 986, 167 U. S. 633, 42 L. Ed. 306.

6. SAME—WEIGHT, BULK, AND CONVENIENCE OF TRANSPORTATION.
     The weight and bulk of the article to be transported, and the convenience
     or inconvenience to the carrier in transporting it, may be considered in rate
     making.

7. SAME—AMOUNT OF THE PRODUCT OR COMMODITY OFFERED FOR TRANSPORTA-
     TION.
     The fact that there is a large amount of a product or commodity in the
     hands of a few persons under almost one control, which is offered for
     shipment at stated intervals, in fixed and continuous quantities, may be
     considered in rate making, thus recognizing the principle of selling cheap-
     er at wholesale than at retail.   Case cited:  I. C. C. v. B. & O. R. Co.,
     12 Sup. Ct. 844, 145 U. S. 263–272, 36 L. Ed. 699.

8. SAME—GENERAL PUBLIC GOOD.
     The general public good may be considered in rate making.   This in-
     cludes the welfare and advantage of the great body of the citizens of the
     United States, who constitute the producers, shippers, and consumers; and
     it also includes the welfare and advantage of the various localities and of

the common carriers. Case cited: I. C. C. v. B. & O. R. Co., 12 Sup. Ct. 844, 145 U. S. 263, 36 L. Ed. 699. See, also, T. & P. Ry. v. I. C. C., 16 Sup. Ct. 666, 162 U. S. 218, 219, 40 L. Ed. 940.

9. SAME—COMPETITION.

Competition may be considered in rate making. The authorities, as well as the experts in these cases, recognize that competition may be a controlling factor. Cases cited: Pickering, Phipps & Co. v. L. & N. W. Ry. Co., 2 Q. B. D. (1892) 229; I. C. C. v. B. & O. R. Co., 12 Sup. Ct. 844, 145 U. S. 263, 36 L. Ed. 699; C., N. O. & T. P. Ry. v. I. C. C., 16 Sup. Ct. 700, 162 U. S. 184, 40 L. Ed. 935; I. C. C. v. Ala. Midland Ry. Co., 18 Sup. Ct. 45, 168 U. S. 164, 42 L. Ed. 414; L. & N. R. Co. v. Behlmer, 20 Sup. Ct. 209, 175 U.S. 648, 44 L. Ed. 309; E. T., V. & G. Ry. v. I. C. C., 21 Sup. Ct. 516, 181 U. S. 1, 45 L. Ed. 719; T. & P. Ry. Co. v. I. C. C., 16 Sup. Ct. 666, 162 U. S. 197, 40 L. Ed. 940; I. C. C. v. L. & N. R. Co., 23 Sup. Ct. 687, 190 U. S. 273, 47 L. Ed. 1047.

10. SAME—NO ONE OF THE ABOVE FACTORS IS ALONE CONTROLLING.

None of the above factors alone are considered as necessarily controlling. Neither are all of them controlling as a matter of law. It is a question of fact, to be decided by the proper tribunal in each case, as to what is controlling. In every case the Supreme Court has held that competition may be controlling. In only one case has it, as a matter of fact, been held not to be a defense.

11. SAME—SECTION 3 OF ACT TO REGULATE COMMERCE—ITS OBJECT.

The object of section 3 of the act to regulate commerce (Act Feb. 4, 1887, c. 104, 24 Stat. 380 [U. S. Comp. St. 1901, p. 3155]) was to prevent undue preference or advantage to any person, company, firm, corporation, or locality, or any particular description of traffic.

12. SAME—UNDUE OR UNREASONABLE PREFERENCE OR ADVANTAGE.

The statute does not define the phrase "undue or unreasonable preference or advantage." Whether a preference or advantage is "undue" or "unreasonable" must be determined by the circumstances of each case.

13. SAME—INEQUALITY OF CHARGE.

Mere inequality of charge does not constitute undue or unreasonable preference or advantage. Railroads are only bound to give the same terms to all persons alike, under the same conditions and circumstances; and any fact which produces an inequality of conditions and a change of circumstances justifies an inequality of charge. Case cited: I. C. C. v. B. & O. R. Co., 12 Sup. Ct. 844, 145 U. S. 272, 36 L. Ed. 699.

14. SAME.

It is proper under the third section to give a preference or advantage or to discriminate between persons, localities, or traffics, provided such preference, advantage, or discrimination be not undue or unreasonable. Cases cited: I. C. C. v. Ala. Midland Ry., 18 Sup. Ct. 45, 168 U. S. 144, 42 L. Ed. 414; C., N. O. & T. P. Ry. v. I. C. C., 16 Sup. Ct. 700, 162 U. S. 184, 40 L. Ed. 935.

15. SAME.

In passing upon the question of undue or unreasonable preference or advantage, it is not only legitimate, but proper, to take into consideration, besides the mere differences in charges, various elements, such as the convenience of the public, the fair interest of the carrier, the relative quantities or volume of the traffic involved, the relative cost of the services and profit to the company, and the situation and circumstances of the respective customers with reference to each other, as competitive or otherwise. Case cited: I. C. C. v. B. & O. R. Co. (C. C.) 43 Fed. 37, affirmed 12 Sup. Ct. 844, 145 U. S. 263, 36 L. Ed. 699.

16. SAME—COMPETITION.

In considering the question of undue or unreasonable preference or advantage prohibited by the third section, competition may be considered. Cases cited: E. T., V. & G. Ry. Co. v. I. C. C., 21 Sup. Ct. 516, 181 U. S. 1, 45 L. Ed. 719; I. C. C. v. Ala. Midland Ry. Co., 18 Sup. Ct. 45, 168 U. S. 144, 42 L. Ed. 414; Judson on Interstate Commerce Law, §§ 175–183; I. C. C. v. Clyde S. S. Co., et al., 93 Fed. 83, 35 C. C. A. 217.

**17. SAME—ORIGINATING COMPETITION.**

Even if one of the defendants (the C. G. W. Ry. Co.) had originated the competition in these cases it would be immaterial. Why a defendant cannot begin the competition is not apparent. Some one must begin, and why not a defendant, if it is losing the business. A contrary construction would discourage competition which the act to regulate commerce, as well as the anti-trust act, was intended to encourage. Cases cited: E. T., V. & G. Ry. Co. v. I. C. C., 21 Sup. Ct. 516, 181 U. S. 1, 45 L. Ed. 719; I. C. C. v. Southern Ry. Co. (C. C.) 105 Fed. 703.

**18. SAME—DISTINCTION BETWEEN ORIGINATING COMPETITION AND REDUCING RATES.**

The C. G. W. Ry. Co., by its contract of August 8, 1902, reduced the rates on live stock products; but it did not originate the competition in those products. That competition was going on beween these different defendants and other railroad companies, with which said contract was made. Each company was striving to get what business it could; and the C. G. W. Ry. Co. reduced the rates in order to get its share of the traffic for which all of defendants had been and were then actively competing.

**19. SAME—REDUCTION OF RATES—WHEN NOT VOLUNTARY.**

The reduction of rates made by the C. G. W. Ry. was forced upon it, as it could not otherwise have continued to successfully compete for the business. Said reduction therefore was not "voluntary" on its part, within the meaning of the law. Case cited: E. T., V. & G. Ry. Co. v. I. C. C., 21 Sup. Ct. 516, 181 U. S. 1, 45 L. Ed. 719.

**20. SAME—DISTINCTION BETWEEN "REAL" AND "POSSIBLE" COMPETITION.**

The fact that defendants might, if they choose to do so, bring about a severe competition in live stock, as in its products, is immaterial. It is sufficient that real and substantial competition is not as severe in live stock, as in its products; and it is useless to inquire whether it might be possible to make competition as severe in the one case, as in the other. Case cited: I. C. C. v. L. & N. R. Co., 23 Sup. Ct. 687, 190 U. S. 273, 47 L. Ed. 1047.

**21. SAME—PARTICULAR DESCRIPTION OF TRAFFIC.**

The construction of the phrase "undue or unreasonable preference or advantage," when applied to "any particular description of traffic," must be the same as when applied to "any particular person, company, firm, corporation, or locality." All of said terms are contained in a single sentence of the third section, and the same construction must be given to all of the sentence that is given to a part of it.

**22. SAME—SECTION 3 OF "ELKINS ACT," APPROVED FEB. 19, 1903.**

Section 3 of the Elkins Act (Act Feb. 19, 1903, c. 708, 32 Stat. 848 [U. S. Comp. St. Supp. 1905, p. 600]) provides a remedy in court, without going before the Interstate Commerce Commission, for any discriminations forbidden by law, including the discriminations or preferences prohibited by sections 1 and 3 of the act to regulate commerce (Act Feb. 4, 1887, c. 104, 24 Stat. 379, 380 [U. S. Comp. St. 1901, pp. 3154, 3155]).

(Syllabus by the Court.)

## In Equity.

Case No. 27,723 was brought by the Interstate Commerce Commission against certain named defendants under sections 1 and 3 of the interstate commerce act of 1887, on the 29th day of April, 1905. In that case a petition was filed before the commission on March 31, 1902, and a hearing was commenced on January 22, 1903, wherein the testimony of about 20 witnesses was taken. As the result of that hearing, an order was entered by the commission on the 7th day of January, 1905, that, in accordance with a report and opinion of the commission in said matter, the relation of rates then maintained and enforced by said defendants in that certain territory described in the petition, whereby their rates for transportation were higher on live cattle and live hogs than upon dressed meats or prepared products of cattle and hogs, on the shipments thereof to Chicago, in the state of Illinois, from points ·on the

Missouri river, Sioux City, in the state of Iowa, to Kansas City, in the state of Missouri, inclusive, and from South St Paul, in the state of Minnesota, or from points in the territory between the Missouri river or South St. Paul and Chicago, constituted a wrongful prejudice and discrimination in violation of the provisions of the act to regulate commerce; and that said defendants, and each of them, were notified and required to cease and desist on or before the 15th day of February, 1905, from maintaining or enforcing the said unlawful relation of rates, and from further continuing said unlawful prejudice and discrimination. Proper notice was served upon the defendants, and they refused to obey said order. Thereafter this proceeding was begun in this court.

On the 17th day of July, 1905, the Interstate Commerce Commission began suit No. 27,829, against said defendants, under section 3 of an act to further regulate commerce with foreign nations and among the states, which took effect February 19, 1903, and known as the "Elkins Act." Act Feb. 19, 1903, c. 708, 32 Stat. 848 [U. S. Comp. St. Supp. 1905, p. 600]. Answers were filed by the defendants therein, in each case, and issue joined on or before the 15th day of September, 1905, at which time the above named interveners filed their petitions for intervention, and issue was joined upon them. Pleas of former suit pending were filed and overruled. An order was then entered in this court combining the two causes.

The prayer of the petitions in these suits is substantially the same; the object in the first suit being to enforce the order of the commission, and in the second suit to require a discontinuance of the discrimination alleged in said petition. The substance of the allegations of the two petitions is: That the defendants were common carriers from the Missouri river and St. Paul to Chicago; that before August 8, 1902, the published rates of the defendants as to fresh meats and packing-house products from the Missouri river and St. Paul to Chicago were the same as were the rates on live cattle and hogs from the same points to Chicago. That upon the mentioned date, the defendant the Chicago Great Western Railway Company made a contract with certain owners of packing houses in Kansas City, St. Joe, and other Missouri river points, in consideration of receiving a certain percentage of their business for seven years. That for that period the said railway company would transport from the Missouri river points and St. Paul to Chicago fresh meats and packing-house products at the following rates:

Statement showing rates on cattle, hogs, packing-house products and fresh meats, car loads, from Missouri river and other points to Chicago, Ill. (Rates in cents per hundred pounds.

| To CHICAGO, ILL., FROM | CATTLE. | HOGS. | PACKING-HOUSE PRODUCTS. | FRESH MEATS. |
|---|---|---|---|---|
| Kansas City, Mo. St. Joseph, Mo. Atchison, Kan. Leavenworth, Kan. | 23.5 b 20 c 18.5 | 23.5 b 20 c 18.5 | 20 a 18.5 | 20 a 18.5 |
| Council Bluffs, Iowa. Omaha, Neb. South Omaha, Neb. Nebraska City, Neb. | 23.5 | 23.5 | 20 a 18.5 | 20 a 18.5 |
| Sioux City, Iowa. | 25 | 23.5 | 20 a 18.5 | 20 a 18.5 |
| St. Paul, Minn., or South St. Paul, Minn. | 25 | 27 b 17.5 | 15.7 a 14.6 | 17 a 15.7 |
| Ottumwa, Iowa. Des Moines, Iowa. Marshalltown, Iowa. Cedar Rapids, Iowa. | 22 22 22 21 | 21 23.5 21 18.5 | 16 18.5 16 13.5 | |

a Destined to points east of Illinois-Indiana state line.
b Applies on shipments originating beyond.
c When originating beyond and destined beyond the Illinois-Indiana state line.

And that at that time, and since, the local rates on live cattle and hogs from said points to Chicago were as above set forth. And they further charge that such condition of rates had existed from that time until the filing of these pe-

titions; that said rates were unreasonable under section 1 of the interstate commerce act; and the result of such condition of rates was that under section 3 of the interstate commerce act and of the Elkins act the defendants were committing an unlawful discrimination against said live cattle and live hogs, the shippers thereof, and the locality of Chicago, and thereby giving an undue and unreasonable preference or advantage to the traffic of fresh meats and packing-house products over said live cattle and hogs.

The Chicago Great Western Railway Company generally denied the violations of the law, and set up that the rates were reasonable and gave no undue advantage; that they were caused by competition and justified by the cost of service; and that the order of the commission was illegal. The other defendants denied said charges in their answers and claimed, among other things, (1) that the said rates for live cattle and hogs were unreasonably low; (2) that there was not undue or unjust prejudice or advantage under section 3, because there was no relation or similarity between the traffic in fresh meats and packing-house products on the one hand and live cattle and hogs on the other, nor was there undue preference of any kind; (3) that when the cost of service was considered it was reasonable to carry the dressed meats and packing-house products cheaper than the live stock; (4) that packing-house products and fresh meats did not compete in any market with the live stock; (5) that when the commercial necessity of the situation was considered there was no undue prejudice against live stock in the rates; (6) that while the value of the service to the producer of the fresh meats and packing-house products was greater than that to the shipper of live stock, yet the risk of its carriage was very much less; (7) that the rate given to the producer of the packing-house products and fresh meats was caused by necessary competition; (8) that the complainant before the commission had no interest in the business and no right to complain; (9) that the contract made by the Chicago Great Western Railway Company with the packers prevents the raising of the price of the products of the packers, and that the railroads could not be forced to lower live stock rates. The interveners filed their petitions objecting to the prayer of the original petitions, and setting out facts tending to show injury to them.

Upon these issues testimony was taken in open court on most of the days from September 15, 1905, to October 14, 1905, and over 40 witnesses were examined, and all but 4 were witnesses who had not been before the commission. The testimony taken before the commission was admitted in evidence, and portions of it read to the court, and all of it considered by the court. The commission came to certain conclusions as to the facts that are fully set forth in their opinion in the case found in 10 Interst. Com. Com'n R. 428, which findings of fact the court assumed in the beginning of this hearing and in his consideration of the case to be the real facts in the case, as required by the statute. The court also considers the conclusions of the commission to be the proper conclusions unless overcome by other testimony produced upon the hearing, although perhaps not required to do so.

. The testimony taken before the court was in part to the following effect:

(1) Upon the question as to whether the rates upon live cattle and hogs from Missouri river points and St. Paul to Chicago were reasonable or unreasonable, witnesses for the defendants, George H. Crosby, freight traffic manager of the Chicago, Burlington & Quincy Railroad Company, William A. Gardner, general manager of the Chicago & Northwestern Railway Company, William E. Keepers, general freight agent of the Northern and Western Lines of Illinois Central Railroad, Fletcher C. Rice, general inspector of transportation for the Chicago, Burlington & Quincy Railroad, J. H. Hiland, third vice president of the Chicago, Milwaukee & St. Paul Railway Company, R. M. Calkins, assistant general freight agent of the Chicago, Milwaukee & St. Paul Railway Company, J. N. Tittemore, freight traffic manager of the Minneapolis & St. Louis Railroad and the Iowa Central Railroad, A. B. Stickney, president of the Chicago Great Western Railway Company, George E. Simpson, superintendent of transportation of the Chicago, Milwaukee & St. Paul Railway, Harry Gower, assistant freight traffic manager of the Chicago, Rock Island

& Pacific Railway Company, John M. Daley, Illinois Central Railroad car accountant, and H. R. McCullough, third vice president of the Chicago & Northwestern Railway Company, testified that such rates were not only reasonable, but were too low. Edward P. Ripley, president of the Atchison, Topeka & Santa Fé Railway Company, and James Peabody, statistician for said company, also testified that such rates were too low; and T. W. Tomlinson and five or six shippers testified, on the part of the commission, that such rates were unreasonably high.

(2) Upon the question of the comparative cost of the service to the carriers in carrying dressed meat and packing-house products and live cattle and hogs, a great deal of testimony was taken on both sides. This subject was gone into by experts far more fully than had ever been done before. Many of the above witnesses on the part of the defendants, made complete and accurate statements of the different items that they thought ought to be considered in determining the cost of service of carriage. The result of all those statements is that it cost far more to carry live stock than it cost to carry fresh meat and packing-house products. They considered, upon the part of fresh meat and packing-house products, the expense of the cost of the refrigerating car, figured at one cent a mile, the terminal charge, in some cases two or three dollars a car, and the extra expense in hauling a heavier load, etc., and, upon the part of the live stock, the extra cost of service incurred by carrying men to take care of the cattle on the way to the market, and return transportation for said men, the extra expense of providing stock yards at every shipping place, costing from $800 to $1,200 and $1,400, amount of damages paid by the railroad companies because of delays in reaching the market and because of the destruction of the property in case of wrecks, etc. All the above-named witnesses for railroads substantially agreed upon these different items. On the part of the commission, Edward P. Ripley and his statistician, James Peabody, made comparative statements of the net results from the carriage of these different commodities, upon basis of average cost of all business, per gross ton mile, which is concurred in by the witness Tomlinson, who made further statements, which figures show that it is more expensive to the company to carry fresh meats and packing-house products than live stock; but they did not consider all the burdens peculiar to live stock. All the witnesses agreed in the showing that the cost of service in proportion to the value of both kinds of commodities was greater in carrying live stock.

(3) Upon the value of the service to the shipper the testimony of all the witnesses substantially agreed that the value of fresh meats was nearly twice as much as that of live stock, and that of packing-house products a large percentage more than that of live stock. It was also substantially agreed by the witnesses that the risk of carriage, notwithstanding the double value of fresh meats, was not as great in carrying fresh meats and packing-house products as in carrying live stock. This is true on account of the damages for delay to live stock, and additional damages in cases of wrecks. There is not much danger of wrecks in either class of business on account of the good condition of the roadbed and equipment of the railroads.

(4) Upon the subject of a proper basis for making rates it was substantially agreed by the witnesses that the following factors were to be considered in fixing a rate: (a) That it had been the practice for years, and was proper, for railroads to exact all the traffic would bear. By this, meaning not to arbitrarily demand certain rates, but what in the wisdom of the railroad officials they thought they could get from the traffic, taking into consideration the future business of the railway, the prosperity of its patrons, the length of the haul, the cheapness and kind of commodity, the profit the shipper could make out of the shipment, and other matters of that kind. This is the "value of service" theory. Experts and the interstate commerce commissioners have agreed that this is a very important factor, and ought to be the most important, unless interfered with by competition or some other factors. It is like the theory of taxation. This includes the consideration of the value of the goods shipped and the profit shippers can make by the carriage. (b) The cost of service of the carriage. This has not been an important factor

in the opinion of the railroad companies in the past, nor their practice; but in this case all seemed to agree that the cost of service ought to be an important factor in determining the rate. Mr. Stickney was of the opinion that the cost of service arrived at intelligently by a body of experts, would be the proper basis upon which to determine fairly to everybody the rate to be adopted, and this could be mathematically figured out all over the country. The other witnesses stated that this cost could not be obtained at all accurately, only approximately. (c) The weight, bulk and convenience in handling commodities. (d) Commercial necessity. It was agreed by all that rates must often be made lower than they would mathematically figure out from cost of service or value to the shipper, because the shipper could not move the commodity unless he got a lower rate than the railroads ought to give him when considering the cost of service. (e) They all agreed that competition was the greatest factor in determining a rate. (f) The testimony was all to the effect that, as to commodity traffic and large shipments subject to competition, no skill or science was required in making rates; that rates were forced on carriers by their competitors, regardless of what the rates ought to be.

(5) The testimony showed that the Atchison, Topeka & Santa Fé Railway Company, the Chicago & Northwestern Railway Company, the Chicago, Rock Island & Pacific Railway Company, and the Chicago, Burlington & Quincy Railroad Company, of the defendants, extend west from the Missouri river; that the other railroad companies extend to the Missouri river points; that cattle and hogs originating west of the Missouri river, and carried to said river by the first named railroads, come to Chicago and Eastern points either upon the balance of the through rates or upon what is called a "proportional rate," and that such proportional rate from Missouri river points and St. Paul to Chicago was equal to or less than the rate upon fresh meat and packing-house products; that the local rate from Missouri river points on live stock to Chicago was according to above schedule; that the rate extended for 100 to 150 miles this side of the Missouri river and St. Paul to all points in that zone; that such rates reduced on going to the east until they got to the Mississippi river; and that the average Iowa rate to Chicago was 21 cents. The evidence also tended to show that quite a large number of cattle were driven in from points east of the Missouri river and east of St. Paul, to the Missouri river and St. Paul.

(6) The undisputed evidence showed that the published rate on fresh meat and packing-house products and live stock from Missouri river points and St. Paul to Chicago were the same up to August, 1902, and that before the railroad injunction referred to in the evidence of March, 1902, the actual rate on live stock was 23½ cents from Missouri river points, and on fresh meat and packing-house products rebates were given, making such rates below 18 cents; that when the said injunction was issued the railroad companies for a time followed the published rate on cattle of 23½ cents from Missouri river points and 25 cents from St. Paul; that the packing houses at Missouri river points and St. Paul are few in number; that they shipped large quantities of their products at regular intervals; that on account of such large quantities owned by a few shippers, they demanded lower rates than the published rate and negotiated with the defendant railroads. The result of the negotiations was that Mr. Stickney, president of the Chicago Great Western Railway Company, in August, 1902, entered into a contract with them for 7 years, providing that said railway for that period have a certain proportion of all said packers' business monthly, and it should carry the same for 20 cents per hundred pounds from the Missouri river points, Kansas City and St. Joseph to Chicago, and 18½ cents from such points to the Indiana and Illinois line, on freight going east of Chicago; that, as stated by Mr. Stickney, the object of his making said contract was to get more of the business, to get what he called his proportion of the business. It appeared that Mr. Stickney's road was the longest route from Missouri river points to Chicago, and that in order to obtain the traffic, or any substantial portion of it, it was necessary for him to make some special arrangement with the packers. Then it became neces-

141 F.—64

sary for the other defendant railroads to ship at the same rate in order to get business. It appears from the testimony of all the railroad witnesses on both sides that these rates, according to their judgment, were caused by competition in rates.

(7) The effect of the present rates upon the shippers of live stock from intermediate points in Minnesota, Iowa, and Missouri, to Chicago, and to the Missouri river points and St. Paul was considered. Evidence was taken upon this subject. Schedules and tables were put in evidence upon this as well as almost every other rate subject. The substance of that evidence tends to show that a majority of the cattle within 150 miles east from the Missouri river and St. Paul went to Chicago rather than to the Missouri river and southeast from St. Paul upon the present rates; in other words, that the Chicago market is not injured by the present rates.

(8) The testimony showed that the Chicago market was the best market, that it controlled the price of all other markets between the Missouri river points and St. Paul, and that the Chicago market fluctuated from 5 cents to 50 or 75 cents in a day.

(9) The testimony showed that the Santa Fé Railroad Company had cut its live stock rate to 12 cents for a short period after August, 1902, when the above rates in question went into effect, and that such lowering of the rates of that company did not increase its business to Chicago.

The above is comparatively a very brief statement of the pleadings, the issues arising thereon, and of over 1,000 pages of testimony taken before the commission, and about 3,000 pages of testimony taken before the court in addition thereto, together with a great many tables, statements, and reports prepared by experts.

L. A. Shaver, C. B. Morrison, U. S. Dist. Atty., and S. H. Cowan, for complainant.

Ed. Baxter, for defendants B., C. R. & N. Ry. Co., C., St. P., M. & O. Ry. Co., Chicago & Alton Ry. Co., C. & N. W. Ry. Co., C., B. & Q. Ry. Co., C., M. & St. P. Ry. Co., C., R. I. & P. Ry. Co., Hannibal & St. J. Ry. Co., Illinois Cent. R. R. Co., Iowa Central Ry. Co., K. C., St. J. & C. B. Ry. Co., M. & St. L. Ry. Co., and Omaha, K. C. & E. Ry. Co.

C. A. Severance, for defendant Chicago Great Western Ry. Co., and intervener St. Paul Union Stock Yards Co.

S. A. Lynde, for defendant C. & N. W. Ry. Co.

Chester M. Dawes, for defendant C., B. & Q. Ry. Co.

James C. Jeffery, for defendant Missouri Pac. Ry. Co.

Charles A. Clark, for intervener T. M. Sinclair & Co., Limited.

Milchrist & Scott, for intervener Sioux City Stock Yards Co.

Ira B. Mills, for intervener Minnesota Railroad and Warehouse Commissioners.

F. T. Ransom, for intervener Omaha Packing Co.

BETHEA, District Judge, after making the above statement, announced the following opinion:

The court has considered all of the evidence in the case, and finds the following facts:

First. That the live stock rates are reasonable in themselves. All live stock from points west, southwest, and northwest of the Missouri river and St. Paul are shipped on a proportional rate from the Missouri river or St. Paul to Chicago. These rates are equal to or less than the rates on dressed meats and packing-house products between

the same points. There can be, and is, no complaint as to such traffic. The local rates from the Missouri river and St. Paul, and from 150 miles east, to Chicago, are as shown in above schedule. These rates gradually decrease until the Mississippi river is reached, and the average Iowa rate is 21 cents. The great weight of evidence indicates that these rates are at least reasonably low.

Second. That the cost of carrying live stock is greater than that of carrying dressed meats and packing-house products.

Third. That the value of the service of carriage is greater to the packers, because of the higher price of a car of dressed meats or packing-house products. Dressed meats and packing-house products are in value worth nearly twice as much as live stock. This factor is important, in ordinary cases, however, in part, because of the greater risk of carriage of high-priced commodities. In these cases as to the particular commodities in question, the evidence shows that the defendant railroad companies pay out a much larger amount in damages for losses arising from the carriage of live stock than they do for losses arising from the carriage of dressed meats and packing-house products, in proportion to the value of the products carried, and more in damages per car regardless of the value. This makes the risk of carriage greater for live stock. The result is that the value of the service is not such an important factor in this kind of a case as it is considered to be in ordinary cases.

Fourth. That the rates in question given to the packers at Missouri river and St. Paul were the result of competition. The product of the packers at these points was large in quantity, was certain and continuous in amount, was in the hands of a few people, and for years before the federal injunction of March, 1902, had been competed for so strenuously by the railroads reaching and passing through these points, as to cause the cutting of rates and the giving of secret rebates in large amounts. Four of the defendant companies, the Chicago, Milwaukee & St. Paul Railroad Company, the Chicago & Northwestern Railway Company, the Chicago, Rock Island & Pacific Railway Company, and the Chicago, Burlington & Quincy Railroad Company, passed through these points into the territory west of the Missouri river and St. Paul. Four other of the defendant companies, the Chicago Great Western Railway Company, the Chicago & Alton Railway Company, the Illinois Central Railroad Company, and the Wabash Railroad Company reached the Missouri river points and St. Paul, competing for this business. Other railroads, running south to the Gulf of Mexico, also competed more or less for said business, including the Atchison, Topeka & Santa Fé Railway. After said injunction was granted the defendant railroads (according to evidence herein) obeyed it, and until August of that year the said traffic was carried under competition between the defendants at the rate of 23½ cents from Missouri river points to Chicago, and 25 cents from St. Paul to Chicago, etc., as set out above. As a result of such competition, the Chicago Great Western Railway Company became dissatisfied with the proportion of the business it received, and in order to get what it claimed as its share cut the rate to 20 cents to Chicago and 18½ cents to the Indiana line for Eastern business, and published

the same. This it did under a contract with the packers running for 7 years. The Chicago Great Western Railway Company was the longest route from Chicago to the Missouri river points. The other railroad defendants, to meet the rate made by the Chicago Great Western Railway Company, as a result of competition, met and published the same rate. These rates were not made voluntarily, but from necessity, same rate. These rates were not made voluntary, but from necessity, arising from competition; the necessity being that of carrying the goods at the lower rate, or losing the business to which the officers of said companies thought they were entitled. This cutting of the rate by the Chicago Great Western Railway Company was not the origin of competition. That had existed legally since March, 1902, between defendant railroads, and also between them and the Atchison, Topeka & Santa Fé Railway Company. There was not competition enough at said points to lower the rate as to live stock. There was little and different competition on rates as to live stock at points between the Missouri river and St. Paul and Chicago. The only places where the opportunities for competition existed as to live stock the same as to packing-house products were immediately at Missouri river points and St. Paul, and there only as to live stock driven in on foot from the surrounding country. There is comparatively a small amount of this stock. If it was exactly the same kind of a commodity as that furnished by the packers there would be an opportunity for competition in this at these points alone.

Fifth. That the competition in question did not result from agreement of the defendants, but was actual, genuine competition.

Sixth. That the present rates on live stock have not materially affected any of the markets, prices, or shipments; that they are reasonably fair to Chicago and to the shippers; that the shipments of live stock from points between Chicago and the Missouri river and St. Paul are as great in proportion to the volume of business as before the present rates were made; that the majority of the live stock comes to Chicago from points as near as 150 miles this side of the Missouri river and St. Paul, and that the lower rate given to the packers does not seem to directly influence or injure the shippers of live stock.

Seventh. That the rates for carrying packers' products and dressed meats were remunerative. They did not pay any portion of the fixed charges and interest of the railroad companies, nor its full share of the operating expenses, but they did pay more than its cost of movement and leave something to apply upon operating expenses.

Eight. That the welfare of the public, including the shippers, consumers, and all localities and markets, does not seem to be materially affected by the present rates.

Ninth. That the usual custom is for railroads to charge a higher rate for the finished product than for the raw material, and this, as a rule, has been applied to live stock and its finished products. This is not universal, however. There are many commodities where the raw material is charged more for carriage than its finished product, as in the case of the raw material of cotton and the compressed cotton, straw, unbaled and baled, pig iron and its products, and many other

commodities. It also appears that for 16 years out of 23, between Missouri river points and St. Paul and Chicago, the published rates on live stock were higher than on dressed meats and packing-house products. Many witnesses testified that the ideal rate for the finished product would be higher than the raw material. This, however, was based on the presumption that competition or commercial necessity did not interfere, and that the cost of service and value of the products would be greater in case of the finished products than in that of the raw material.

What is the law applicable to the above facts? These petitions were filed to enforce sections 1 and 3 of the interstate commerce act (Act Feb. 4, 1887, c. 104, §§ 1, 3, 24 Stat. 379, 380 [U. S. Comp. St. 1901, pp. 3154, 3155]) and section 3 of the Elkins act (Act Feb. 19, 1903, c. 708, 32 Stat. 848 [U. S. Comp. St. Supp. 1905, p. 600]). They are as follows:

"Section 1. All charges made for any service rendered or to be rendered in the transportation of passengers or property as aforesaid, or in connection therewith, or for the receiving, delivering, storage or handling of such property, shall be reasonable and just; and every unjust and unreasonable charge for such service is prohibited and declared to be unlawful."

"Sec. 3. That it shall be unlawful for any common carrier subject to the provisions of this act to make or give any undue or unreasonable preference or advantage to any particular person, company, firm, corporation or locality, or any particular description of traffic, in any respect whatsoever, or to subject any particular person, company, firm, corporation or locality, or any particular description of traffic, to any undue or unreasonable prejudice or disadvantage in any respect whatsoever."

Elkins act:

"Sec. 3. That whenever the Interstate Commerce Commission shall have reasonable ground for belief that any common carrier is engaged in the carriage of passengers or freight traffic between given points at less than the published rates on file, or is committing any discriminations forbidden by law, a petition may be presented alleging such facts to the Circuit Court of the United States sitting in equity having jurisdiction." etc.

The questions are: Do the facts in these cases show that the defendants have, under section 1 of the interstate commerce act, furnished reasonable rates? Have they, under section 3 thereof, given any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, or locality, or any particular description of traffic in any respect whatever? Have they, under section 3 of the Elkins act, committed any discriminations forbidden by law? Or, in other words, did it make an undue preference in favor of the packers, or their products, at the Missouri river points and St. Paul, or unjustly discriminate against live stock, the shippers thereof, or against Chicago, for the defendants to lower the rates for the packers without making the same or a greater reduction for the shippers of live stock?

1. The evidence above shows that section 1 has not been violated. The rates were not unreasonable.

2. Section 3 of the Elkins act covers the same questions as do sections 1 and 3 of the original interstate commerce act. That section provides a remedy without going before the Interstate Commerce Com-

mission for the allowing of any discriminations forbidden by law. Those forbidden by law,, so far as the questions involved in these cases are concerned, are the prohibitions in sections 1 and 3 of the interstate commerce act. Section 1 is disposed of. Section · 3 will hereafter be discussed.

3. Does the evidence show a violation of section 3 of the interstate commerce act?

(A) The principal objects of the interstate commerce act, as shown by the many cases in the Supreme Court of the United States, were to secure just and reasonable charges for transportation; to prohibit unjust discriminations in the rendition of like service under similar circumstances and conditions; to prevent undue or unreasonable preference to persons, corporations, or localities; to inhibit greater compensation for a shorter than for a longer distance over the same line; and to abolish combinations for the pooling of freight. It was not designed to prevent competition between different roads, but rather to encourage competition. The railroad companies, under the decisions of the courts in England and the United States, are only bound under this act to give the same terms to all persons alike under the same conditions and circumstances, and any fact which produces an inequality of condition and a change of circumstances justifies an inequality of charge. Interstate Commerce Commission v. Baltimore & Ohio Railroad Company, 145 U. S. 272, 12 Sup. Ct. 844, 36 L. Ed. 699. The object of section 3 was to prevent undue or unreasonable preference or advantage to any person, company, firm, ·corporation or locality, or any particular description of traffic. The statute does not define undue or unreasonable preference or advantage. That must be left to the circumstances of each case. It is proper, under this section, to give a preference or an advantage, or to discriminate between persons, localities or traffic; but not make them undue or unreasonable. Interstate Commerce Commission v. Alabama Midland Railway Company, 168 U. S. 144, 18 Sup. Ct. 45, 42 L. Ed. 414; Cincinnati, New Orleans & Texas Pacific Railway Company v. Interstate Commerce Commission, 162 U. S. 184, 16 Sup. Ct. 700, 40 L. Ed. 935.

(B) What is meant, then, by "undue" or "unreasonable" preference or advantage? Judge Jackson in the case of Interstate Commerce Commission v. Baltimore & Ohio Railroad Company (C. C.) 43 Fed. 37, stated that:

"These words necessarily involve the idea or element of comparison of one service or traffic with another similarly situated and circumstanced, and require that, to be undue and unreasonable, the preference or prejudice must relate and have reference to competing parties, producing between them unfairness and an unjust inequality in the rates charged them, respectively, for contemporaneous service under substantially the same circumstances and conditions. In determining the question whether rates give an undue preference or impose an undue prejudice or disadvantage, consideration must be had to the relation which the persons or traffic affected bear to each other and to the carrier. When and so long as their relations are similar or 'substantially' so, the carrier is prohibited from dealing differently with them in the matter of charges for a like and contemporaneous service. * * * The English cases referred to above, and others that might be cited, establish the rule that, in passing upon the question of undue or unreasonable prefer-

ence or advantage, it is not only legitimate, but proper, to take into consideration besides the mere differences in charges, various elements, such as the convenience of the public, the fair interest of the carrier, the relative quantities or volume of the traffic involved, the relative cost of the services and profit to the company, and the situation and circumstances of the respective customers with reference to each other, as competitive or otherwise."

This opinion was affirmed in 145 U. S. 263, 12 Sup. Ct. 844, 36 L. Ed. 699, and followed in other opinions of the Supreme Court.

(a) A careful examination of the opinions of that court (as well as the evidence taken in these cases) shows that there are a great many factors and circumstances to be considered in fixing a rate. Noyes, Am. R. R. Rates, pp. 61 et seq., 85-109. Among other things: (1) The value of the service to the shipper, including the value of the goods and the profit he could make out of them by shipment. This is considered an ideal method, when not interfered with by competition or other factors. It includes the theory so strenuously contended for by petitioners, the commission, and its attorneys, of making the finished product carry a higher rate than the raw material. This method is considered practical, and is based on an idea similar to taxation. Interstate Commerce Commission v. B. & O. Ry. Co. (C. C.) 43 Fed. 37, 53; Noyes, Am. R. R. Rates, 53. (2) The cost of service to the carrier would be an ideal theory, but is not practical. Such cost can be reached approximately, but not accurately enough to make this factor controlling. It is worthy of consideration, however. Interstate Commerce Commission v. B. & O. Ry. Co., supra; Ransome v. Eastern Railway Company (1857) 1 C. B. 437, 26 L. J. C. P. 91; Judson on Interstate Commerce, §§ 148, 149; Western Union Telegraph Co. v. Call Publishing Co., 181 U. S. 92, 21 Sup. Ct. 561, 45 L. Ed. 765; Interstate Commerce Commission v. Detroit, Grand Haven & Milwaukee Railroad Co., 167 U. S. 633, 17 Sup. Ct. 986, 42 L. Ed. 306. (3) Weight, bulk, and convenience of transportation. (4) The amount of the product or the commodity in the hands of a few persons to ship or compete for, recognizing the principle of selling cheaper at wholesale than at retail. Interstate Commerce Commission v. B. & O. Ry. Co., 145 U. S. 263, 12 Sup. Ct. 844, 36 L. Ed. 699. (5) General public good, including good to the shipper, the railroad company and the different localities. Interstate Commerce Commission v. B. & O. Ry. Co., 145 U. S. 263, 12 Sup. Ct. 844, 36 L. Ed. 699. (6) Competition, which the authorities, as well as the experts, in their testimony in these cases, recognize as a very important factor. Pickering Phipps v. London & Northwestern Railway Company, 2 Q. B. D. (1892) 229 (this case construes section 2 of the English act of 1854, which is almost like section 3 of our interstate commerce act); Interstate Commerce Commission v. B. & O. Ry Co., supra; Cincinnati, New Orleans & Texas Pacific Railway Company v. Interstate Commerce Commission, 162 U. S. 184, 16 Sup. Ct. 700, 40 L. Ed. 935; Interstate Commerce Commission v. Alabama Midland Railway Company, 168 U. S. 144, 18 Sup. Ct. 45, 42 L. Ed. 414; Louisville & Nashville Railroad Co. v. Behlmer, 175 U. S. 648, 20 Sup. Ct. 209, 44 L. Ed. 309; East Tennessee, Virginia & Georgia Railway Co. v. Interstate Commerce Commission, 181 U. S. 1, 21 Sup. Ct. 516, 45 L. Ed. 719;

Texas & Pacific Railway Co. v. Interstate Commerce Commission, 162 U. S. 197, 16 Sup. Ct. 666, 40 L. Ed. 940; Interstate Commerce Commission v. Louisville & Nashville Railroad Co., 190 U. S. 273, 23 Sup. Ct. 687, 47 L. Ed. 1047. The Supreme Court has also held that it may be presumed that Congress, in adopting the language of the English act, had in mind the constructions given to the words "undue preference" by the courts of England. Interstate Commerce Commission v. B. & O. Ry. Co., 145 U. S. 284, 12 Sup. Ct. 844, 36 L. Ed. 699.

None of the above factors alone are considered necessarily controlling by the authorities. Neither are they all controlling as a matter of law. It is a question of fact to be decided by the proper tribunal in each case as to what is controlling. In every case the Supreme Court has held that competition may be controlling. In only one case has it, as a matter of fact, been held not to be a defense.

(C) Counsel for the commission strenuously contend in able arguments that competition does not apply to section 3 of the interstate commerce act. The authorities, however, are to the contrary. The question was raised in substantially all of the above and others of the Supreme Court cases wherever section 4 was considered. In the following cases the Supreme Court has held that this principle of competition applies to section 3. East Tennessee, Virginia & Georgia Ry. Co. v. Interstate Commerce Commission, 181 U. S. 1, 21 Sup. Ct. 516, 45 L. Ed. 719, and cases cited; Interstate Commerce Commission v. Alabama Midland Railway Company, 168 U. S. 144, 18 Sup. Ct. 45, 42 L. Ed. 414, and cases cited from English court; Judson on Interstate Commerce, §§ 175 to 183; Interstate Commerce Commission v. Clyde S. S. Co., 93 Fed. R. 83, 35 C. C. A. 217.

(D) But it is further claimed by petitioners' counsel that competition should not have any effect in settling the questions involved in these cases, because one of the defendants originated the competition. The Interstate Commerce Commission in its opinion considered the facts as to competition and found they did not control the fixing of rates. Its opinion, and the concurring opinion of Commissioner Knapp, show, however, that the majority of the commission acting in this case (Fifer and Prouty) thought that it was not a case to which competition applied. Their position is that competition cannot apply to this case because one of the defendants (the Chicago Great Western Railway Company) originated the competition in rates. They argue that in all of the other cases decided by the Supreme Court the competition resulting in the cutting of rates was begun by some transportation company not a defendant in the hearing before the commission and the court, and that the identical question involved in this case has not been passed upon by the Supreme Court. They further argue that in those cases the question as to the construction of the words "particular description of traffic" was not raised or disposed of. In reply it may be said that the questions of undue preference against persons or localities were in the decided cases, and those questions are in these. Besides an undue preference cannot be given to a "particular description of traffic" without giving it to a "person" also.

The same principle must apply to the traffic. The same construction must be given to all of the sentence that is given to a part of it. One sentence in section 3 applies to persons, localities, and particular descriptions of traffic. The same words "undue preference" apply to all those conditions, and the words "undue preference" must mean the same when applied to one condition as to another. It may be that the cases passed upon by the Supreme Court were cases where the railroad company starting the lowering of the rate was not a defendant. But the courts have held that where the rate is first lowered by competitors subject to the interstate commerce law, the competition must be considered. East Tennessee, V. & G. Ry. Co. v. Interstate Commerce Commission, 181 U. S. 1, 21 Sup. Ct. 516, 45 L. Ed. 719; Interstate Commerce Commission v. Southern Railway Company, (C. C.) 105 Fed. 703. If counsel's contention was correct, the right of the railroad companies to set up competition as a defense could be removed by making the company starting the reduction of rates a party defendant. This construction would also discourage competition which the act, as well as the anti-trust act, was intended to encourage. East Tennessee, V. & G. Ry. Co. v. Interstate Commerce Commission, 181 U. S. 1, 21 Sup. Ct. 516, 45 L. Ed. 719; Interstate Commerce Commission v. Southern Railway Company (C. C.) 105 Fed. 703. Why a defendant cannot begin the competition is not apparent. Some one must begin. Why not a defendant, if he is losing the business?

The facts in these cases, however, show that competition was going on between these different defendants and other railroad companies that were not defendants (particularly the Atchison, Topeka & Santa Fé Railway Company) before the granting of the injunction in March, 1902, and that such competition was going on under the law after March, 1902, down to August 8, 1902, when the Chicago Great Western Railway Company's contract was made and the above rates fixed. Each company was striving to get what business it could. The Atchison, Topeka & Santa Fé Railway Company, which is not a defendant here, was a very formidable competitor and had perhaps the shortest route between the points in question. The other railroad companies, who had longer routes, as did the Chicago Great Western Railway Company, in order to get business, were forced to do something to accommodate and please their patrons. That was going on during all the time mentioned, and was competition. So it cannot be said that competition was originated by the Chicago Great Western Railway Company. That company first lowered the rates, and competition forced the other defendants, including the Atchison, Topeka & Santa Fé Railway Company, to lower their rates. It is the duty of the officers of a railroad company to get business in the interest of its stockholders. It appears, then, under the facts, that the reduction of rates was not voluntary, according to the definition and description thereof in the case of East Tennessee, V. & G. Ry. Co. v. Interstate Commerce Commission, supra, and other cases, but was caused on the part of the Chicago Great Western Railway Company by the necessity

of competing for business which under the law they were required to do.

(E) The evidence shows that the rates were (1) remunerative, (2) reasonable, (3) that competition was not the result of agreement, and (4) that the carrier must reduce the rate or lose the business. There was, then, a meeting here of all the four conditions required by the law to make competition a factor in the fixing of these rates. This is set out by Mr. Judson in his work on Interstate Commerce (section 183) in a discussion of section 3 and effect of competition on it, in the following language:

"But under the decisions of the Supreme Court, the application of the competitive rule is subject to the following qualifications: First. The competition must compel the lower rate; that is, the competition must be controlling. The carrier must either reduce its rates or ·lose the business. Second. The competition must not be created by the carrier; that is, the preference must not be affected through an agreement or combination of the carrier with other carriers stifling competition. Third. The competitive rate must be at the pre- ·ferred point remunerative to the carrier. Fourth. The rates must be reasonable in themselves."

That author shows in section 183 how materially competition has affected the enforcement of section 3 of the interstate commerce act. It must be remembered in reference to this question of competition that there are more railroads competing for the packers' products than for the live stock, as shown in the findings of fact, supra. There are four railroads west of the Missouri river carrying live stock east to Chicago, besides the Atchison, Topeka & Santa Fé Railway Company. There are eight of the defendant railroads competing for the packers' products at the Missouri river to carry it east to Chicago. There are other railroads running south from the Missouri river that may make more or less competition. As to the live stock originating east of the river, there is much less and an entirely different kind of competition from that arising at the Missouri river points and St. Paul for the packers' business. Upon the principles announced in the above authorities, if the different commodities were exactly the same, as if it were all live stock or all packers' product, the railroads would have a right to consider, east of the Missouri river and St. Paul, the stronger competition at Missouri river points and St. Paul in fixing their rate the same as they do under section 4, or the long and short haul clause. So we are limited to the live stock driven into the Missouri river points and St. Paul, in determining whether that commodity is there entitled to the same rate as packers' products shipped from those same points.

(F) The contention is that because the defendant companies have reduced the rate there as to packers' commodities they must reduce it at the same identical points as to live stock. But there is strong competition at all those points as to packers' products—competition in rates—and there is no such competition at the same points as to live stock. It is argued that because they compete as to one kind of a commodity they must compete as to other kinds of commodities at the same points. This is substantially the same question that was raised in the case of Interstate Commerce Commission v. Louisville

& Nashville Railroad Company (La Grange) 190 U. S. 273, 23 Sup. Ct. 687, 47 L. Ed. 1047. In that case the Interstate Commerce Commission held that because the defendant companies competed at one point they must compete at another; but the Supreme Court, speaking through Mr. Justice White, said:

"In the report of the commission a suggestion is found that La Grange should be entitled to the same rate as Atlanta, because, if the carriers concerned in this case in connection with other carriers reaching La Grange choose to do so, they might bring about competition by the way of a line between Macon and La Grange, which would be equivalent to the competitive conditions existing at Atlanta. We are unable, however, to follow the suggestion. To adopt it would amount to this: That the substantial dissimilarity of circumstances and conditions provided by the act to regulate commerce would depend, not as has been repeatedly held, upon a real and substantial competition at a particular point affecting rates, but upon the mere possibility of the arising of such competition. This would destroy the whole effect of the act and cause every case where competition was involved to depend, not upon the fact of its existence as affecting rates, but upon the possibility of its arising."

The same principle must apply here. The construction is of the same sentence. In that case it was a portion of the sentence that referred to localities or certain shippers, or a certain kind of a particular description of traffic, if you please. In these cases it refers to a "description of traffic" and "to shippers."

(G) In passing upon this question of competition it is the duty of the commissioners and the court to take into consideration, in determining whether the circumstances and conditions are the same, and whether prejudice is undue or not, the quantity of the traffic in each case. While this may not be controlling, still it ought to be considered. In the Party Rate Case, supra (145 U. S. 272, 12 Sup. Ct. 844, 36 L. Ed. 699), it was held controlling as to passengers. In the English cases above cited it has been held a very important factor as to freight. The facts show that there is a large amount of packers' product to be shipped at stated intervals, fixed and continuous quantities, in the hands of a few people, under almost one control. The live stock is not in such hands, and cannot and does not create such competition. Noyes, Am. R. R. Rates, 102. After considering as far as possible all the surrounding circumstances and conditions, and considering the rates between the two classes of products involved in these suits, and the law as announced by the Supreme Court, this court holds that lawful competition must be considered as a factor in determining the questions of fact as to undue preference and unjust discrimination.

The court is bound to consider all of the above facts and factors with others, in determining whether the preference and advantage in question is "undue" or "unjust." In such consideration there appears in favor of the preference and advantage given to the packing-house products—the cost of service, the damage to the commodities, the quantity of the commodity in the hands of a few persons, the less bulk, the interest of the railroad companies, the interest of a majority of the localities and consumers, the general dissimilarity of conditions, and competition. While there is, in favor of the live stock, the less value of the product and of the service in the carriage, the interests of

Chicago and its markets, the stockyards, and dealers in live stock there. The evidence shows that in substantially all cases the factor of competition alone controls the rate. The Supreme Court in all cases has held that competition may be controlling. In only one case (Social Circle) has competition as a matter of fact been held not to make a defense to the charge of discrimination or undue preference. When all the factors are considered together, the conclusion must be reached that the preference and advantage in question is not "undue" or "unjust," and section 3 of the interstate commerce act has not been violated; nor has section 1 of that act, nor section 3 of the Elkins act. Upon a consideration of all the evidence the court holds that the prima facie case made by the findings of the commission has been overcome by the evidence offered before the court. The order of the commission in the first case is not lawful and should not be enforced, and the prayer of the petition in the second case should be denied.

The petitions of the Interstate Commerce Commission are dismissed, with costs.