### 13945. PHARR COTTON COMPANY *v.* DAVIS, agent.

Under the facts of this case the words " Via Union Compress at Augusta," written in bills of lading issued in the State of Georgia for interstate shipments of cotton, amounted to a valid and enforceable contract requiring the carrier to compress at Augusta, Georgia, the cotton thus shipped, and did not constitute an unlawful or undue preference in favor of the shipper and against others similarly situated. The published tariffs having permitted the carrier to exercise an option as to compressing cotton, and being silent as to whether the option should be exercised with or without a contract, there was no legal reason why the option should not be exercised by contract; and there was no evidence that the carrier refused to make similar contracts with other shippers.
The plaintiff was entitled to recover for breach of the contract in question, and the trial judge erred in directing a verdict in favor of the defendant.

DECIDED JULY 10, 1923.

Action for breach of contract; from Wilkes superior court — Judge Shurley. July 19, 1922.

Application for certiorari was denied by the Supreme Court.

Pharr Cotton Company sued the director-general of railroads, alleging, in part, that it made several shipments of baled cotton from points within to points without the State of Georgia, all on through contracts; that for each shipment it was given a bill of lading, in which was written " Via compress at Augusta;" that when bales of cotton are compressed, " bagging and patching " to the amount of five pounds is put upon each bale, and this is " in-

cluded in the weights collected by the shipper and paid for by the consignee, and is by mutual understanding of the parties added to the weight of the shipment. All of this is done by mutual understanding, and is the custom of the trade and known to said railroad company;" that the railroad company failed to have said cotton compressed, and "the result and effect of this was that there was no accession to the weight of said cotton which was expected by all parties, and . . petitioners were damaged to the extent of the value of said five pounds to each bale." Judgment was prayed for the amount of the alleged damage.

The plea of the defendant denied liability, and further alleged, "that, as was his duty, said defendant had printed and was keeping open to public inspection schedules showing all of said rates and stating separately all privileges or facilities which in anywise changed, affected, or determined any part of the aggregate of such aforesaid rates and charges, or the value of the services rendered to the shipper or consignee; and that said schedules were printed and copies thereof posted as required by law;" "that neither said schedule or tariff, nor any other schedule or tariff, gave the shipper or the consignee the right to require the compression of said cotton, or any part thereof; "that even if this defendant attempted to enter into a contract with said plaintiffs to compress said cotton (which this defendant denies), said contract was and is null and void and without legal effect, because the plaintiff had no right to require that said cotton should be compressed; that whether it should be compressed or not was to be determined by the carrier at its option, and that therefore any alleged contract on the part of this defendant to compress said cotton would be without consideration, and would make or give to the plaintiffs an undue and unreasonable preference or advantage over other shippers."

The bills of lading in this case each contain the following: "Each carrier over whose route cotton is to be transported hereunder shall have the privilege, at its own cost and risk, of compressing the same for greater convenience in handling or forwarding, and shall not be held responsible for any deviation or unavoidable delays in procuring such compression." In addition to some oral evidence there was an agreed statement of facts, which in part was as follows: "Dealers and purchasers of cotton pay one quarter of a cent per pound more for cotton uncompressed than

for compressed cotton, and when cotton is compressed the market price is reduced by said margin. Cotton when compressed has bagging and patching put upon each bale to the amount of five pounds, this five pounds, which would have been added to the weight if compressed, was included in the weights of the various shipments set out in the bills of lading, and freight paid on the same, and if the bales of cotton involved in this suit which were not compressed had been compressed before reaching destination, each bale so compressed would have weighed five pounds more than it did weigh. This cotton was sold on sight draft with bill of lading attached, and the bills of lading on each shipment included this five pounds which should have been added when compressed. Freight was paid on this and the draft included in this amount. When the cotton reached destination and weighed five pounds less than the invoice and bill of lading called for, the purchasers made demand upon the sellers, plaintiffs in this case, for the difference five pounds weight on each bale of cotton, resulting from the failure to compress. Bagging at the time of this shipment cost and was worth six cents per pound. The price and value of bagging at the time these shipments were made was thirty cents per bale, or six cents per pound. . . The only thing relating to compression of cotton in connection with this shipment were the words inserted on the bills of lading, reading ' Via Union Compress at Augusta,' and the rules contained in the cotton tariff of the defendant, published and filed with the interstate-commerce commission, as hereinbefore more specifically set out. All the cotton involved in this case was shipped from points in the State of Georgia to points in other States, under a through contract of shipment. At the time the shipments involved in this suit were made, rates for the transportation of said cotton and the terms under which it would be transported and all privileges to which shippers thereof might be entitled had been lawfully established and set out in certain cotton tariffs published and filed with the interstate-commerce commission, as required by law; the defendant had printed and was keeping open to public inspection printed schedules showing all the rates applicable to transportation of said cotton and stating separately all privileges and facilities which in anywise changed, affected, or determined, any part of the aggregate of the rates and charges or the value of the services ren-

dered to the shipper or consignee, and said schedules were printed and copies thereof posted as required by law, and said schedules or tariffs had likewise been filed with and approved by the interstate-commerce commission. Said schedule or tariff governing all of the shipments involved in this suit and prescribing the rates for said shipments contained, as to shipments to Carolina points, under the heading 'Notes, rules and regulations,' the following: 'The rates published in this tariff apply only on compressed or uncompressed cotton (except sea island cotton) in bales, carrier's option to compress, and when shipped subject to the conditions of the carrier's bill of lading, except as provided herein.' There were no exceptions in the tariff to the above rule touching upon the question of compression. And as to shipments destined to other eastern points the tariffs contained, under the heading 'Notes, rules and regulations,' the following: 'The rates published herein apply in cents per one hundred pounds on cotton in bales compressed or uncompressed, with carrier's option to compress, and when shipped subject to the carrier's bill of lading.' All the shipments involved in this suit were shipped subject to the carrier's bill of lading, with the words written in each bill of lading 'Via Union Compress at Augusta.' Neither the plaintiff nor the consignee paid any other or higher rate of freight for the transportation of this cotton than that named in the schedule of tariff above referred to. Neither did the schedule referred to, nor any other schedule or tariff, give the shipper or consignee the right to require the compression of cotton involved in this suit, the only reference to compression in any of the tariffs applicable to this shipment being those quoted above. The defendant did not arbitrarily neglect to have said cotton compressed, but, at the time when these shipments moved, the several compresses mentioned in the bills of lading were extraordinarily and unusually congested and were refusing to receive cotton for compression; and to have held the cotton which was uncompressed in Augusta until an opportunity could have been had to compress the same would have resulted in indefinite delay in transportation of the cotton to destination. Plaintiffs, when this cotton was received for shipment, were not notified of this condition or congestion, but the cotton was received by the railroad. It is agreed that the number of bales of cotton shipped from Washington that reached

destination uncompressed was 2130. All the cotton involved in this suit was being shipped either to the Carolina or eastern points referred to in the tariffs quoted above."

After the evidence was all introduced the court directed a verdict for the defendant. The plaintiff excepted.

*Colley & Colley,* for plaintiff.

*Cumming & Harper, W. A. Slaton,* for defendant.

LUKE, J. (After stating the foregoing facts.) The controlling question in this case is whether or not the words " Via Union Compress at Augusta," written on the face of the bills of lading issued by the defendant to the plaintiff, amounted to a binding and enforceable contract requiring the defendant to compress, at Augusta, Ga., cotton delivered to the defendant at Washington, Ga., for shipment? All the shipments involved in this suit were shipments from a point in the State of Georgia to points outside the State, and were, therefore, subject to the act to regulate commerce between the States. This act, which is commonly known as the interstate-commerce act, provides, among other things, that " Every common carrier . . shall file with the commission, . . and print and keep open to public inspection, schedules showing all the rates. . . The schedules printed as aforesaid . . shall contain the classification of freight in force and shall also state separately all terminal charges and all other charges which the commission may require, all privileges·or facilities granted or allowed and any rules or regulations which in anywise change, affect, or determine any part of the aggregate of such aforesaid rates, fares and charges, or the value of the service rendered to the passenger, shipper or consignee." 4 Fed. Stat. Ann. 406, § 6 (U. S. Comp. Stat., § 8569). It therefore becomes necessary to determine whether or not there was anything filed with the interstate-commerce commission upon the subject of compressing cotton. That there was is shown conclusively by the following provisions of the schedules and tariffs filed by the defendant with the commission: " The rates published in this tariff apply only on compressed or uncompressed cotton (except sea island cotton) in bales, carrier's option to compress, and when shipped subject to the conditions of the carrier's bill of lading, except as provided herein." And further: " The rates published herein apply in cents per hundred pounds on cotton in bales compressed or un-

pressed, with carrier's option to compress, and when shipped subject to the conditions of the carrier's bill of lading."

Able counsel for the defendant contend that when the railroad published its schedules and reserved to itself the right to compress or not to compress, it did not thereby grant to shippers at large the right to have cotton compressed, and, not having granted to shippers at large the right to have cotton compressed, the contract made with the shipper in the instant case, to compress his cotton, was an unjust discrimination, and therefore void and unenforceable. While it is the settled law of this forum, as well as that of our sister States, that "a railroad company which is an interstate common carrier cannot enter into a contract with a shipper which constitutes an unlawful or undue preference under the interstate-commerce act" (*Florida R. Co.* v. *Cherokee Sawmill Co.,* 137 *Ga.* 815, 821, 74 S. E. 523; see also *Draper* v. *Ga., Fla. & Ala. Ry. Co.,* 21 *Ga. App.* 707, 712, 95 S. E. 16, and cit.), we do not agree with counsel in the instant case that the contract under consideration was void because it gave the shipper an unlawful or undue preference. While the interstate-commerce act has been construed by the interstate commerce commission and various State courts (see Gamble-Robinson Com. Co. *v.* Chicago &c. Ry. Co., 168 Fed. 161, 166, 167, 94 C. C. A. 217, 21 L. R. A. (N. S.) 982, 16 Ann. Cas. 613) differently from the construction placed upon it by Judge Jackson (afterwards Mr. Justice Jackson of the United States Supreme Court) in the case of Interstate Commerce Commission *v.* Baltimore & Ohio R. Co. (C. C.), 43 Fed. 37, his is the true and correct interpretation of this act. Judge Jackson's construction of the act, which has been several times approved and adopted by the United States Supreme Court, is as follows: "Subject to the two leading prohibitions that their charges shall not be unjust or unreasonable, and that they shall not unjustly discriminate, so as to give undue preference or advantage, or subject to undue preference or disadvantage *persons or traffic similarly circumstanced,* the act to regulate commerce leaves common carriers as they were at common law, *free to make special contracts (as was done in the case under review) looking to the increase of their business, to classify their traffic, to adjust and apportion their rates so as to meet the necessities of commerce, and generally to manage their important interests upon the same*

*principles which are regarded as sound, and adopted in other trades and pursuits."* (Italics ours.)

Applying this clear statement of the law to the instant case, we cannot say that the contract under consideration constituted an unjust or undue " preference " in favor of the present shipper and against others similarly situated. The published tariffs having permitted the carrier to exercise its option as to compressing cotton, and being silent as to whether it should exercise this option with or without a contract, there is no legal reason why either method could not have been pursued. Thus, it is obvious that the carrier, in exercising its option to compress, could as easily discriminate without a contract as with one. Nor can it be said that the contract under consideration shows, as a matter of law, that the railroad company extended to the plaintiff a preferential privilege; and there was no evidence whatever adduced upon the trial to the effect that the carrier refused to make similar contracts with other shippers. We conclude, that, since the published tariffs expressly gave the carrier the option to compress, and since discrimination could have resulted with or without a contract to compress, and since the carrier in the instant case did contract to compress the plaintiff's cotton, it is bound by that contract, and liable for the breach thereof.

It follows from what has been said that the court erred in directing a verdict for the defendant.

*Judgment reversed. Broyles, C. J., concurs. Bloodworth, J., dissents.*